STOLTZ, WAGNER & BROWN, a partnership, and Universal Resources Corporation, a corporation, Plaintiffs,

v.

J. Walter DUNCAN, Jr., an Individual, et al., Defendants.

Civ. No. 75–0801–D.

United States District Court,
W. D. Oklahoma.

April 16, 1976.

H. B. Watson, Jr., Gregory L. Mahaffey, Oklahoma City, Okl., for plaintiffs.

Philip D. Hart, Ray G. Moss, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

DAUGHERTY, Chief Judge.

In this case the Plaintiffs seek to quiet title in and to certain oil and gas leasehold estates in Section 1, Township 9 North, Range 10 West, Caddo County, Oklahoma against the Defendants. The Defendants by way of Counterclaim seek to quiet title in and to certain oil and gas leasehold estates in said Section against the Plaintiffs.

Plaintiffs claim that Defendants (1) had and have no standing as a lessee with reference to the drilling.of a well in said Section, (2) had and have no operating rights in said Section under the pooling order of the Oklahoma Corporation Commission,[1] and, (3) have not drilled the well in said Section in good faith and with the diligence of a prudent operator thereby failing to hold any leasehold interests they may have owned.

Defendants counter by saying that Plaintiffs "top leased"[2] their leases in said Section; that said top leases are void as being in violation of the Rule Against Perpetuities as recognized in Oklahoma; that Defendants owned leasehold interests in said Section on or before August 6, 1975 by assignment of same from Apexco, Inc., and on or before August 7, 1975 Defendants possessed operating rights in said Section by a transfer thereof from Edwin L. Cox; that on or before August 6, 1975 the Defendants started the drilling of a well in said Section (known as the Harrision No. 1 well) as an oil and gas lessee possessing operator rights; that Defendants started said well in good faith during the primary terms of their leases which were "commencement" type leases[3] and pursued the drilling of said

---

1. On August 6, 1975 the Oklahoma Corporation Commission entered a pooling order for said Section by which the Section was pooled or unitized, the well location in the Section was fixed and Edwin L. Cox was designated as the operator of the unit. The area had previously been spaced at 640 acres by the Oklahoma Corporation Commission.

2. A "top lease" is one taken by a lessee from a lessor who has previously given a lease on the same interest to another, which previous lease had not expired at the time the top lease was taken.

3. Defendants' leases were "commencement form" leases which provide:

"If the lessee shall commence to drill a well within the term of this lease or any extension thereof, or on acreage pooled therewith, the lessee shall have the right to drill such well to completion with reasonable diligence and

well with the diligence of a prudent operator to total depth; that said well at time of trial is in the process of being completed as a producer and that by commencing the drilling of said well in good faith on said date and drilling said well as a prudent operator, Defendants' commencement type leases continue in force and effect are now in force and effect as against any rights of the Plaintiffs by virtue of their top leases.

## RULE AGAINST PERPETUITIES

Of probable threshold importance in this controversy is Defendants' claim that Plaintiffs' top leases are wholly void as violating the Oklahoma Rule Against Perpetuities (hereafter sometimes referred to as the Rule). If this contention is correct and said leases are wholly void it would appear that Defendants should prevail herein as the Oklahoma rule applicable in this diversity action is that a plaintiff having no title or interest in the land (leasehold) in question cannot maintain an action to quiet title thereto. *Pauline Oil & Gas Co. v. Fischer,* 191 Okl. 346, 130 P.2d 305 (1942); *Robertson v. Knighten,* 192 Okl. 678, 139 P.2d 601 (1943). A federal court will look to the law of the state where the land lies to determine a plaintiff's standing to maintain an action to quiet title. *Williams v. Pacific Royalty Company,* 247 F.2d 672 (Tenth Cir. 1957); *Midwestern Developments Inc. v. City of Tulsa, Oklahoma,* 374 F.2d 683 (Tenth Cir. 1967); *Dudley v. Meyers,* 422 F.2d 1389 (Third Cir. 1970). Plaintiffs appear to subscribe to the foregoing for they assert that if Defendants had no leasehold interests in Section 1 on or before August 10, 1975[4] they cannot raise the invalidity of Plaintiffs' top leases for violating the Rule, citing 70 C.J.S. Perpetuities § 80, p. 684.

Oklahoma recognizes the Rule Against Perpetuities. Article II, Section 32 of the Constitution of Oklahoma provides in part as follows:

> dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well has been completed within the term of years first mentioned."

"Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, . . ."

The Oklahoma Supreme Court in *Melcher v. Camp,* 435 P.2d 107 (Okl.1967) held that the Rule Against Perpetuities has common law application in Oklahoma with this language:

> " . . . No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest."

Also see *Cities Service Oil Co. v. Sohio Petroleum Co.,* 345 F.Supp. 28 (W.D.Okl. 1972); *Francis v. Superior Oil Co.,* 102 F.2d 732 (Tenth Cir. 1939).

In 1971 the Oklahoma Legislature passed the following Statutes:

60 Oklahoma Statutes § 75

*Reformation of interests violating Rule Against Perpetuities—Intent*

"Any interest in real or personal property that would violate the Rule Against Perpetuities shall be reformed, or construed within the limits of the Rule, to give effect to the general intent of the creator of that interest whenever that general intent can be ascertained. This provision shall be liberally construed and applied to validate such interest to the fullest extent consistent with such ascertained intent.

60 Oklahoma Statutes § 76

*Construction in accordance with cy pres doctrine*

"To effectuate the provisions hereof, all courts of this state are, within their otherwise jurisdictional limits, hereby granted the power to reform or construe interests in real or personal property, as provided in Section 1 hereof, in accordance with the doctrine of cy pres.

60 Oklahoma Statutes § 77

See *Nickel v. Jackson,* 380 F.Supp. 1389 (W.D. Okl.1974).

4. This was the latest expiration date of leases claimed by Defendants.

*Reformation of offending instruments*

"If an instrument violates the Rule Against Perpetuities, but can be reformed or construed in accordance with the provisions of this act, it shall not be declared totally invalid. Rather, the provisions thereof that do not offend the Rule shall be enforced, and only the provisions thereof that do violate, or might violate, the Rule shall be subject to reformation or construction under the doctrine of cy pres within the terms of this act."

Plaintiffs' top leases taken in June, 1975 in part provide:

"TO HAVE AND TO HOLD the same (subject to the other provisions herein contained) for a term of one (1) year from and after the 8th day of August, 1975, or from and after the expiration of the existing oil and gas lease, whichever is the later, hereafter called 'primary term' and as long thereafter as oil, gas, gas condensate, gas distillate, casinghead gas, casinghead gasoline and other minerals may be produced from said leased premises or operations for the drilling and production thereof are continued as hereinafter provided."

■ The top leases provide disjunctive dates for the commencement of the one year term. No problem exists with the Rule regarding the first of these commencement dates, namely, "the 8th day of August, 1975." In all events this would be a vesting and commencement within the perpetuity period of some life in being and 21 years thereafter. However, if the base leases (which have been top leased) were extended by production in the primary term or by the commencement of a well in the primary term followed by production, the one year primary term of the top leases under either commencement date could not commence until after the expiration of the existing oil and gas leases. In this connection it should be recognized that the Plaintiffs took the gamble in top leasing in this section, that the holders of the base leases they topped would not obtain production within the primary terms of their leases or commence a well within the primary terms

of their leases followed by production. Thus, if the existing leases were permitted to expire Plaintiffs' top leases would take effect on August 8, 1975 but if the existing leases are extended by drilling operations and production the top leases would not take effect until an unknown date in the future, namely, "from and after the expiration of the existing oil and gas lease." With production being obtained in the primary term or a well being commenced in the primary term, followed by production, Plaintiffs lost their gamble and must lose their quest to quiet their title against the leases they topped. Hence, the top leases were not wholly void when taken in June, 1975 as violating the Rule because the one year primary term could commence under the first alternative, specifically on August 8, 1975. That provision does not violate the Rule.

■ The second disjunctive proviso for the commencement of the top leases, namely, "to have and to hold . . . for a term of one (1) year . . . from and after the expiration of the existing oil and gas lease, whichever is the later," appears to violate the Rule Against Perpetuities. The Rule is violated when there is a possibility of vesting beyond the perpetuity period. *Melcher v. Camp, supra,* 435 P.2d at page 115. The top leases were taken in June of 1975 when there were existing base leases, the primary terms of which would expire in August of 1975. Hence, the possibility existed in June, 1975 that a well could be commenced before the expiration of the existing base leases, the same could be drilled to production and the ensuing life of production could possibly exceed the period permitted by the Rule. The second alternative provision in the top leases thus appears to violate the Rule unless the top leases are reformed under the foregoing statutory authority.

At this time the second proviso would be the later of the two alternatives provided for in the top leases if the terms of Plaintiffs' leases did not commence on August 8, 1975. Thus, if the existing base leases are continued by the commencement of a well

the second proviso if enforced would determine when the top leases start and as they may not start within the perpetuity period they violate the Rule and are void unless they may be reformed under 60 Oklahoma Statutes §§ 75–77, *supra*. In this connection counsel for Plaintiffs at arguments agreed that Plaintiffs may not wait until the Harrison Well (assuming it becomes a producer) ceases to produce which could be beyond the perpetuity period and assert then that Plaintiffs have a valid oil and gas lease within a one year primary term. It would therefore appear that the "general intent" mentioned in 60 Oklahoma Statutes § 75 was that Plaintiff had a lease to be had and held for a primary term of one year from and after August 8, 1975 subject to the existing base leases and if the existing base leases which they top leased were permitted to expire without production or the commencement of a well in term followed by production the top leases would be enforcible. According to Plaintiff, (the lessee of the top leases) it was not the intent of the creators (lessors of the top leases) that the primary term should begin after cessation of production should such production perpetuate the existing base leases.

■ Therefore, under the reformation power provided by 60 Oklahoma Statutes §§ 75, 76 and 77, the top leases should be reformed to give effect to the "general intent" of the creators (lessors). That is to say, the top leases should be reformed by the separation and elimination of the second proviso which offends the Rule. This conforms with the doctrine of cy pres [5] under which the intention of the party (lessor) is carried out *as nearly as may be* when

it is impossible or illegal to give literal effect to the instrument (top leases) involved.

The above determination appears to have support in the decision of *Francis v. Superior Oil Company*, 102 F.2d 732 (Tenth Cir. 1939) an Oklahoma case involving an oil and gas lease and the Rule. This case was decided before the passage of the aforementioned reformation statutes. In *Francis, supra*, the lease provided that the lessors:

"'. . . have this day granted and leased and do hereby grant, lease, and let . . . .' the premises; and further that the lease should 'remain in force for a term of five years from the date the lessee may legally and peacefully enter upon and drill on said leased premises, and so long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is or can be produced from the leased premises.'" 102 F.2d 735.

When this lease was given the lessee could not legally and peacefully enter upon and drill upon the leased premises because a City ordinance prohibited such action. The lease was attacked as violating the Rule for it was possible that the City would never permit drilling or would not permit drilling on the premises until a date beyond the perpetuity period. The Court did not permit the Rule to invalidate this lease and stated:

". . . The parties did not know, and in the very nature of things they could not know, whether the restrictions would be removed, and if so when; but in many instances where no time is fixed in a contract within which an act shall be

---

**5.** The doctrine of cy pres is defined in Black's Law Dictionary, 4th Edition as follows:

"The rule of *cy pres* is a rule for the construction of instruments in equity, by which the intention of the party is carried out as *near as may be*, when it would be impossible or illegal to give it literal effect. Thus, where a testator attempts to create a perpetuity, the court will endeavor, instead of making the devise entirely void, to explain the will in such a way as to carry out the testator's general intention as far as the rule against perpetuities will allow. So in the case of

bequests to charitable uses; and particularly where the language used is so vague or uncertain that the testator's design must be sought by construction. *Beekman v. Bonsor*, 23 N.Y. 308 [298], 80 Am.Dec. 269; *Doyle v. Whalen*, 87 Me. 414, 32 A. 1022, 31 A.L.R. 118; *Philadelphia v. Girard*, 45 Pa. 28[9], 84 Am.Dec. 470; *People v. Braucher*, 258 Ill. 604, 101 N.E. 944, 946, 47 L.R.A.,N.S., 1015; *Tincher v. Arnold*, C.C.A.Ill., 147 F. 665; *Crane v. Morristown School Foundations*, 120 N.J.Eq. 583, 187 A. 632, 635.'"

performed or a condition brought about, the law intervenes and supplies a reasonable time for that purpose. It must be presumed that the parties executed the lease with the contemplation that the restrictions would be lifted within a reasonable time or the contract would terminate. Such contemplation was implicit in the contract." 102 F.2d 735.

Thus, if the restriction against drilling was not removed within a reasonable time the lease would not be valid. Presumably a reasonable time would fall far short of the perpetuity period. It appears that the principle earlier applied in *Francis* and the authority later granted by 60 Oklahoma Statutes §§ 75–77 are analogous. At least they both serve to avoid the effect of the Rule, one by termination within a reasonable time if a restriction on entering and drilling is not removed and the other by reformation to allow non-offending provisions to be enforced.

The Plaintiffs when their top leases were taken and the lessee in *Francis* when that lease was obtained were then not able to drill. Plaintiffs could not drill because of superior rights in existing base leases. The lessee in *Francis* could not drill because of the City ordinance prohibiting the drilling. Plaintiffs' top leases were to start for a term of one year on August 8, 1975, a date after which the base leases they topped might expire or for such term after the expiration of the existing base leases whichever is later. The lessee in *Francis* could drill within five years after the City permits drilling by repeal of the existing prohibitory ordinance. Thus, the similarity in the two cases is that the lessors could validly lease without running afoul of the Rule but the leases would not be effective if the restrictive conditions were not removed within a reasonable time or the leases reformed to enforce valid provisions and remove provisions violating the Rule.

There exists one possibility which will not permit the Court to wholly void Plaintiffs' top leases at this time. Their top leases were to start for a term of one year from August 8, 1975 or the expiration of the existing leases. The existing base leases would be extended beyond their expiration dates in August, 1975 by the commencement of a well within their terms. If a well started in term under the base leases is a producer and produces beyond August 8, 1976, the one year primary term of Plaintiffs' top leases would never be effective. If, however, a well started in term is not a producer and is so determined before August 8, 1976 Plaintiffs could have valid leases for the remaining balance of the specifically prescribed one year primary terms.

The top leases should be reformed by the Court to eliminate the starting provision that violates the Rule and the provision that does not violate the Rule should have validity for the prescribed one year term "from and after the 8th day of August, 1975," subject to the existing base leases. Hence, the language in the top leases which provides: "or from and after the expiration of the existing oil and gas lease, whichever is the later," should be eliminated by reformation. Plaintiffs' top leases, recognizing the existing base leases, do not cloud title thereto so long as said base leases subsist. Thus, it becomes necessary to consider Plaintiffs' other contentions and determine if the base leases under which Defendants claim have been properly continued in force and effect by the commencement of a well within the primary terms.

LESSEE STANDING OF DEFENDANTS

Plaintiffs contend that Defendants did not have standing as an oil and gas lessee in Section 1 on or before August 10, 1975 (the last day of the primary term of one of the oil and gas leases which Defendants claim entitled them to commence drilling operations). Plaintiffs allege that Defendants lacked authority or standing as a lessee to commence the drilling of the well in Section 1 and were volunteers or trespassers on the land in Section 1 on and before the above date because the formal instrument of assignment from Apexco to Defendants covering an 80 acre leasehold

interest in said Section 1 was not executed by Apexco until August 18, 1975.[6]

The evidence does not support this contention of Plaintiffs. The evidence reveals and the Court finds that on August 5, 1975 Defendants and Apexco reached an agreement whereby Apexco assigned an 80 acre leasehold interest in said Section 1 to the Defendants. This agreement was immediately confirmed by the parties in a letter dated August 5, 1975 and signed by Defendants in Oklahoma City on said date which letter Apexco accepted and approved by the signature of its representative in Tulsa on August 6, 1975. By telephone on August 6, 1975, Defendants were informed by Apexco that it had signed the letter agreement in Tulsa that day covering said assignment and would that day mail same to Defendants in Oklahoma City. The letter agreement was not in Defendants' hands on August 6, 1975 when they commenced the well and the assignment formalizing the letter agreement of August 5–6, 1975 was not executed by Apexco until August 18, 1975. The letter agreement was eventually received by Defendants as was the assignment, the latter being then appropriately recorded. Apexco does not question the validity of this assignment of August 5–6, 1975. Only Plaintiffs, as nonparties to the assignment, object to the validity of this assignment.

It is the undisputed evidence before the Court that it is the custom in the oil and gas industry to do business and act on letter agreements without having in hand the formal instruments requisite for recordation.[7] This is not only a well recognized way of doing business in the oil industry [8] but it is a commendable way of bringing about mutual faith and reliance in responsible people whereby their signatures to a letter agreement become their bond. Under such circumstances and as said custom is applied herein, the Defendants had, owned and possessed an 80 acre leasehold interest in Section 1 on August 6, 1975 in sufficient manner to give them the requisite standing and authority as a lessee to commence well drilling operations. Though it might technically be argued in some situations that Defendants were not lessees until they received the Apexco assignment executed by Apexco on August 18, 1975 and even had recorded the same, it is believed that for

---

6. During arguments the Plaintiffs made the contention for the first time that there was no delivery from Apexco to Defendants of the letter agreement regarding said 80 acre leasehold interest entered into between them prior to the expiration of the primary terms of the leases covered thereby. Not only does this contention come too late to warrant consideration but the delivery rule should have no application to the question of standing or authority to commence a well especially when the same is raised by a non-party to the agreement, who takes nothing in the interim. In 23 Am.Jur.2d, Deeds, § 285, page 318 it is said:

"Relation back to date of precedent contract.

As between the parties, and for the advancement of justice, a deed may be deemed to relate back to the date that the grantor agreed to sell and the grantee agreed to purchase the premises. Such doctrine of relation back, however, is never applied to the prejudice of third persons, such as an innocent purchaser or mortgagee who takes in the interim between the contract and the deed."

and at § 313, page 344 it is said:

"Undelivered writings.

Until a voluntary deed is delivered and accepted, it is only a mere proposal to convey which may be withdrawn at any time. Nevertheless, with respect to the force of an undelivered writing in view of the statute of frauds, some authorities take the view that it is not essential that the memorandum be delivered, provided it was intended to evidence a contract between the parties, and so, in such jurisdictions at least, a writing, although not delivered as a deed, may be available to furnish evidence of the agreement, or to supply an omission from the written memorandum of the contract."

7. A custom and usage is defined as any practice or method of dealing having such regularity of observance in a trade or industry as to justify an expectation that it will be observed with respect to any transaction in question. 12A Oklahoma Statutes 1–205; *United States v. Stanolind Crude Oil Purchasing Co.*, 113 F.2d 194 (Tenth Cir. 1940); *LaVelle v. Fair Oil Company*, 388 P.2d 13 (Okl.1963).

8. Of which the Court could take judicial notice. "The court will take judicial notice of a general trade usage." *Stanolind Crude Oil Purchasing Co., supra.*

lessee standing purposes to commence the drilling of a well the execution of the letter agreement by the parties thereto is sufficient. Such is also sufficient then to support the continuance of the leases in effect by the timely commencement of a well. Moreover, Apexco without question had the standing of a lessee in Section 1 and if Defendants had no lessee standing of their own as technically urged by Plaintiffs they commenced the well in lease term with authority from and as agents of Apexco.

Plaintiffs' reliance on *True Oil Co. v. Gibson*, 392 P.2d 795 (Wyo.1964) is misplaced. In that case the parties were still negotiating about the farmout (by which leasehold rights were obtained) when the primary term expired. Here the parties had ended all negotiations about the assignment of the 80 acre leasehold interest and they had reached a written agreement assigning the same from Apexco to Defendants prior to the expiration of the primary terms.

Thus, the Court finds and concludes that Defendants had standing and authority as an oil and gas lessee in Section 1 on August 6, 1975 sufficient to permit them to commence drilling operations thereon or on said date Defendants commenced drilling operations as agents of Apexco under their lessee rights. This contention of Plaintiffs is rejected.

## OPERATOR RIGHTS

■ Somewhat related to the foregoing subject (Lessee Standing) is Plaintiffs' claim that Defendants did not have operator rights in the pooled unit established by the Order of the Oklahoma Corporation Commission dated August 6, 1975 with ref- erence to Section 1. Plaintiffs assert that Defendants' lack of operating rights in Section 1 prevents a continuation of their leasehold interests beyond the expiration of their primary terms even though Defendants commenced a well in term. The evidence reveals that in July, 1975 Edwin L. Cox filed an Application with the Oklahoma Corporation Commission to pool or unitize Section 1. He requested therein to be designated as the operator of the unit. A hearing was held on July 24, 1975 and apparently no one contested Cox as the unit operator. In any event the Oklahoma Corporation Commission by its Order dated and entered August 6, 1975 granted the Application of Cox and pooled Section 1, designating Cox as the operator of the unit.

The evidence further revealed that sometime prior to August 1, 1975 Cox had decided not to drill Section 1. By verbal agreement Cox relinquished or gave his operator rights if and when granted by the Oklahoma Corporation Commission to Defendants. This was confirmed by Cox by letter to Defendants bearing date of August 7, 1975. Cox does not question the Defendants' authority as operators of the unit involved. Only Plaintiffs question this notwithstanding the interesting fact that they as leasehold owners in the unit have elected to participate in the well with Defendants as the operator. No one has asked the Oklahoma Corporation Commission to make a change in its designation of Cox as operator of the unit.

The parties have presented the Court no law on this matter.[9] No statute or rule appears to deal directly therewith. There is evidence introduced that it is the custom [7] in the oil and gas industry that one designated as the operator of a well may simply

---

**9.** At arguments Plaintiffs referred to Oklahoma Corporation Commission Rule 26 which deals with Relief from Orders. Under this Rule one aggrieved with an Order of the Commission may within ten days after the same is entered seek rehearing, vacation, amendment or modification. After ten days a separate proceeding must be instituted. But the Rule does not prescribe that Defendants had to get Commission approval of the Cox transfer of operator rights.

Plaintiffs were allowed under this Rule to seek relief from the Commission about the operator within the prescribed period had they desired to do so. Or were permitted to institute a new proceeding. But they have not gone to the Commission, rather have elected to participate in the well with Defendants as the operator. This Rule is not deemed to be applicable to the situation at hand.

transfer his operator authority to another when he decides not to drill. However, there is some applicable law that assists the Court with this proposition. In the case of *Simpson, Fell v. Stanolind Oil And Gas Co.*, 210 F.2d 640 (Tenth Cir. 1954) our Circuit in an Oklahoma case held that the continuation of an oil and gas lease was not affected by a well location because the well location was situated in violation of an Oklahoma Corporation Commission Order. The well was not located where an Order of the Commission said it would be located. The lease was nonetheless continued in effect by the drilling of the improperly located well. By analogy it would appear that a well commenced by one not designated by an Order of the Commission as the operator should continue the lease in effect particularly when he has a leasehold interest in the property. The case of *Superior Oil Company v. Oklahoma Corp. Commission*, 206 Okl. 213, 242 P.2d 454 (1952) holds that the owner of leasehold rights has the right to drill a well though not designated the operator by the Commission. The case further holds that in such circumstances the driller assumes the entire risk of the venture if it proves a failure and that if production is obtained he is accountable to his co-tenants for the market value of their share of the production less the reasonable and necessary expense of development, operation and marketing.

On the basis of the above custom and the aforesaid applicable law it is not believed that a violation of a Commission Order (which is not believed to have occurred in this case) would prevent a lessee from continuing his lease by commencing the drilling of a well in the primary terms.

Moreover, it is significant that as a practical matter the operation of a well for a unit is essentially an arrangement between the parties interested in the unit. The Oklahoma Corporation Commission will decide a controversy between two or more persons who may desire to operate a well in the same unit but customarily the Commission grants requested authority to operate a unit when the same is not contested. Thus, it is not enough to vitiate rights under a lease that one drilling a well may not have official operator designation by a pooling Order of the Commission.

The Court therefore finds and concludes that either by the transfer of operator rights from Cox to Defendants or by Defendants commencing the well the Defendants on or before August 7, 1975 possessed operating authority or rights sufficient for them to commence the drilling of the Harrison well in Section 1 so as to continue the effect of their leases. Moreover, Cox had operator rights and if he could not transfer the same to Defendants as urged by Plaintiffs the Defendants are deemed to be operating the well with authority from and as agents of Cox.

If operating authority is a viable problem regarding this well it should be resolved by the Oklahoma Corporation Commission, not this Court. This Court merely holds that Defendants had sufficient operating authority and right to commence the drilling of the Harrison well when they did.

## COMMENCEMENT OF WELL

The Court finds and concludes from the circumstances of this case as established by the evidence that Defendants commenced the Harrison well on August 6, 1975 within the primary terms of their leases, did so in good faith with the unqualified intention to drill the well and pursued drilling activities from the above date to total depth with the reasonable diligence of a prudent operator.

Pertinent law on this facet of the case has been clearly enunciated in Oklahoma. In *Simons v. McDaniel*, 154 Okl. 168, 7 P.2d 419 (1932) the Oklahoma Supreme Court announced:

"Therefore we hold that the grant to lessee plaintiff of the right to commence a well at any time within the term fixed by the lease contract, by necessary legal implication, carried with it the right to complete the well after the period fixed

for commencement had expired, subject, however, to abandonment of that right by failure to proceed in good faith and with diligence."

Also see *Allen v. Palmer,* 201 Okl. 673, 209 P.2d 502 (1948); *Gillespie v. Dougherty,* 179 Okl. 330, 65 P.2d 486 (1937); *Cosden v. Carter Wolf Drilling Co.,* 183 F.2d 761 (Tenth Cir. 1950); *Nickel v. Jackson, supra.*

In *Jones v. Moore,* 338 P.2d 872 (Okl.1959) the Oklahoma Supreme Court held that an oil and gas lessee has the right under a commencement type lease to commence a well on the last day of the term of the lease in the following language:

> "That Moore and associates had the right under the above paragraph to commence well No. 2, even on the last day of the term is not open to discussion. If well No. 2 was commenced in good faith on September 6, 1956, then Moore and associates were entitled to complete such well provided they used reasonable diligence in the drilling thereof." 338 P.2d at 875.

The Oklahoma Supreme Court has also rejected the argument that to commence a well under a commencement type lease it is required that the drilling bit must pierce the earth before the end of the primary time. *Cromwell v. Lewis,* 98 Okl. 53, 223 P. 671 (1924); *Smith v. Gypsy Oil Co.,* 130 Okl. 135, 265 P. 647 (1928); *Aldridge v. Gypsy Oil Co.,* 132 Okl. 13, 268 P. 1109 (1928).

Hence, the Defendants had the right on August 6, 1975 to commence the Harrison well in Section 1 and were not required to cause the drilling bit to pierce the earth before the end of the primary terms of their leases. But on said date Defendants must have had the good faith intention to unqualifiedly drill the well and must have commenced drilling the well on said date and pursued such drilling as a reasonably prudent operator.

The evidence reveals that Defendants decided to drill the Harrison well on August 1, 1975 upon fulfillment of two conditions on or before August 7, 1975, the last day of the primary term of their earliest expiring lease as follows:

(1) Obtaining a leasehold interest in Section 1 from Apexco, and,

(2) Getting the Oklahoma Corporation Commission to sign a pooling order for Section 1 on the pending Application of Edwin L. Cox and obtaining his operator authority.

On August 1, 1975 Defendants' Landman was directed by Defendants to satisfy these conditions. Defendants' Production Superintendent was directed on the same date by Defendants to cause the Harrison well to be staked, the location work begun and a rig obtained to drill the well. The well was staked on August 2, 1975 by Laughlin-Simmons and Co. An intention to drill the Harrison well with Walter Duncan, Jr., as operator was filed with and approved by the Oklahoma Corporation Commission on August 4, 1975. An 80 acre leasehold interest was obtained by Defendants from Apexco on August 5, 1975 and confirmed by letter agreement dated August 5/6, 1975. The Oklahoma Corporation Commission entered the pooling order on August 6, 1975. Edwin L. Cox transferred his operator rights to Defendants and on August 7, 1975 he confirmed this by letter. The Landman satisfied the two conditions and reported this to the Production Superintendent on August 6, 1975. The location or dirt work was started on August 6, 1975 (after a preliminary meeting with the dirt contractor on the site on August 4, 1975) pursuant to a dirt contract entered into by Defendants with the Ada Rig Company. A bulldozer with operator was moved onto Section 1 on August 6, 1975 and dirt work was commenced on the well location on that date. The Production Superintendent undertook to obtain a drilling rig but without immediate success. However, on September 2, 1975 the first drilling rig after the conditions were met by Defendants' Landman became available to Defendants and was immediately contracted for. Rat and Mouse hole work was done on September 3, 1975. The rig began moving on the location on September 3, 1975. The well was spudded on September 8, 1975. Total depth was reached on December 1, 1975. Completion

work on the well is now underway. Plaintiffs do not question the prudent operation of Defendants in the well completion efforts.

Plaintiffs claim that the dirt work for the well was not prudently accomplished as it took about 30 days to be completed. This claim is rejected. The dirt work contractor had only one piece of equipment (a bulldozer) and one operator available at the time. The equipment and operator went to work on the location on August 6, 1975. The operator worked approximately 8 hours every day except Sundays and one holiday. Another piece of equipment with an operator was later added. The rig was moved on the location before the dirt work was completed. Though the dirt work on many wells of this type has been accomplished quicker, this is usually because of a rig deadline which requires a heavy concentration of equipment and operators in order to prepare the location for the entry of a rig. As Defendants were unable to obtain a drilling rig after the two conditions were met no rig deadline had to be met. The evidence presented is to the effect that it is not unusual to accomplish the dirt work on a well location of this type with only one piece of equipment and one operator and to require 30 days or even more to complete such work.

Plaintiffs further claim that Defendants took around 30 days to contract for their drilling rig and this makes them imprudent operators. This claim is also rejected. Defendants had no rigs of their own. The evidence was that at this time drilling rigs of this type were quite scarce and very difficult to obtain as all were working or otherwise engaged. Defendants contracted for the first rig that became available to them after the two conditions were met. Defendants made a diligent and reasonable effort to locate and contract for a drilling rig. Good faith and diligence in this regard are indicated by the evidence.

The Court also rejects Plaintiffs' claim that the dirt work and the matter of obtaining a rig were deliberately slowed down in order for Defendants to examine the electric log on the offset well to the north which reached total depth on August 31, 1975 with the log completed on September 1, 1975. Defendants had an interest in this offset well and thus were entitled to examine this log. They did so immediately. However, the log was bad and disappointing. Had this been the key to Defendants' drilling the Harrison well logic dictates that Defendants would have then abandoned the Harrison operation after examining this bad log. But Defendants did not so act. With the bad and disappointing information at hand from the log on the well to the north Defendants nonetheless entered into a contract to drill the Harrison well at an estimated cost of $1,000,000.00 and drilled the well. It was the testimony of Defendants that the decision of August 1, 1975 to drill the Harrison well was based on Defendants' geology. This geology was introduced in evidence and indicates that the probable success of the Harrison well was based on geological determinations not controlled by the north offset. The geology for the Harrison well was based on a structure tied to a well to the southeast and was not dependent upon the success or failure of the north offset. Of course, under the circumstances and with the right to examine the log of the north offset, it is to be expected that Defendants would take advantage of this opportunity to immediately look at this log. But had Defendants been proceeding in bad faith and were actually waiting for this log information before forming an unqualified intent to drill the Harrison well, Defendants would not have proceeded further with the Harrison well in view of the disappointing log from the north offset. Instead, Defendants drilled the Harrison well which conduct supports Defendants' testimony that the decision was made on August 1, 1975 to drill the Harrison well subject to the fulfillment of the two conditions aforementioned and that the well was commenced and drilled with the requisite good faith. The dirt work, though not as fast as it could have been, is satisfactorily explained by the circumstanc-

es then and there existing as to this well and is deemed to have been prudently accomplished. The drilling of the well to total depth after the rig was moved on is not questioned as to prudent operations. No complaint is raised as to prudent completion. There is no intimation that Defendants had any kind of financial problems regarding the drilling of this well. Defendants were well informed in the area and heavily involved therein. These factors all support the requisite good faith.

Based on the above, the Court finds and concludes that Defendants held their leasehold interests by the commencement of the Harrison well and title should be quieted in the same against the top leases of the Plaintiffs. This is to say that the Court finds and concludes that the Defendants had the intention to drill the well to completion and drilled the well with the diligence of a prudent operator.

### CONCLUSION

In view of the foregoing Plaintiffs' action should be dismissed as Plaintiffs have not shown that they are entitled to the relief they request and Defendants are entitled to Judgment on their Counterclaim herein quieting their title in Section 1 as against the top leases of the Plaintiffs. Counsel for Defendants will prepare an appropriate Judgment based on the decisions the Court has expressed herein and present the same to the Court for signature and entry herein after Plaintiffs' approval thereof as to form only.