**PETROLEUM ENERGY, INC., Plaintiff,**

v.

**MID–AMERICA PETROLEUM, INC., et al., Defendants.**

No. 85–1017–T.

United States District Court,
D. Kansas.

Sept. 30, 1991.

Joseph H. Cassell, Wichita, Kan., for plaintiff.

Lawrence M. Gurney, Wilson, Lee & Gurney, Wichita, Kan., for defendants Mid–America Petroleum, Inc. & MAP 1984–1 Drilling Partnership.

Jim Forsyth, Newton Law Office, Anthony, Kan., for defendant Charles D. Williams, Jr.

ORDER (Nunc Pro Tunc)

JOHN THOMAS REID, United States Magistrate Judge.

This case was tried to the court pursuant to 28 U.S.C. § 636(c). Following a trial to the court, defendants Mid–America Petroleum, Inc. and MAP 1984–1 Drilling Partnership have filed their proposed findings of fact and conclusions of law (Doc. 77). Defendant Charles Williams, Jr. has also filed his findings of fact and conclusions of law (Doc. 76). Supplemental briefs requested by the court have also been filed by both parties (Doc. 82, 83, 84). The parties have stipulated that this court has jurisdiction and that the law governing this case is the law of Kansas. Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. In 1979, Charles D. Williams, Jr., Patricia Williams and Fannye E. Williams owned the entire fee title to real property described as the Northwest Quarter (NW/4), Section Fifteen (15), Township Thirty-five (35) South, Range Five (5) West, Harper County, Kansas (hereafter referred to as "the acreage") (Pretrial order, stipulation).

2. Charles D. Williams, Jr., Patricia Williams and Fannye E. Williams executed an oil and gas lease, dated December 26, 1979, to W.W. Blair, Inc. covering the acreage (Pretrial order, stipulation; Exhibit A).

3. At all times material to this action either Mid–America Petroleum, Inc., or MAP 1984–1 Drilling Partnership held the right, title and interests created by the December 26, 1979 lease covering the acreage (Pretrial order, stipulation) (The court will hereafter refer to these two parties as "MAP").

4. Patricia Williams, wife of Charles D. Williams, Jr., died in 1980. Charles D. Williams, Jr. inherited all of her right, title and interest to the acreage. Fannye E. Williams died in 1982. Charles D. Williams, Jr. is the duly appointed administrator of the estate of Fannye E. Williams (Pretrial order, stipulation).

5. Charles D. Williams, Jr., in his own name and as administrator of the estate of Fannye E. Williams, executed an oil and gas lease, dated December 28, 1984, covering the acreage to Petroleum Energy, Inc. (Pretrial order, stipulation; Exhibit B).

6. The 1979 lease was filed with the Harper County Register of Deeds on February 28, 1980, at Book 79, page 411. The 1984 lease was filed with the Harper County Register of Deeds on January 2, 1985, at Book 82, page 88 (Pretrial order, stipulation).

7. The 1979 lease provided that:
> ... this lease shall remain in force for a term of Five years from date (therein called primary term) and as long thereafter as oil or gas, or either of them is produced from said Land by the lessee
>
> ...
>
> Drilling operations or mining operations shall be deemed to be commenced when the first material is placed on the leased premises or when the first work, other than surveying or staking the location, is done thereon which is necessary for such operations....
>
> If the lessee shall commence to drill a well or commence reworking operations on an existing well within the term of this lease or any extension thereof, or on acreage pooled therewith, the lessee shall have the right to drill such well to completion or complete reworking operations with reasonable diligence and dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years first mentioned (Exhibit A).

8. The acreage covered by the 1979 and 1984 leases is referred to by the parties and the witnesses as the Williams 15–1B site.

9. MAP had the 15–1B site staked on December 17, 1984 (Exhibit K).

10. Steffen and Field, dirt contractors, were contacted December 20, 1984 concerning work at the 15–1B site (R. at 88).

11. The firm of Steffen and Field performed work on the 15–1B site from December 22, 1984 to January 8, 1985, as set forth in Exhibits D and N.

12. Steffen and Field were hired to prepare the 15–1B site, which had to be completed before the drilling could begin (R. at 35–38).

13. MAP hired Energy Development & Exploration (ED & E), a drilling company, to perform drilling operations at the 15–1B site. A notice of intention to drill at the 15–1B site, filed with the Kansas Corporation Commission, is dated either December 14, 1984 or December 19, 1984. It lists ED & E as the contractor, and indicates the starting date for drilling is December 24, 1984 (Exhibit H). The written contract between MAP and ED & E was signed on December 28, 1984 (Exhibit F).

14. ED & E was not immediately available to drill at the 15–1B site. MAP and ED & E entered into an agreement that ED & E

would begin work at the 15–1B site immediately after they finished their work at another site. MAP was unable to find another drilling company that could have moved more quickly to the 15–1B site (R. at 204–206).

15. MAP had some difficulty in obtaining a permit from the highway department to move the drilling rig because the highway department will not issue permits in bad, icy weather (R. at 45–46).

16. The drilling rig was at the 15–1B site on December 30, 1984, and drilling operations commenced on January 3, 1985 (R. at 215–218).

17. Once the dirt contractor and the drilling contractor commenced work on the Williams 15–1B site, the contractors proceeded diligently and with dispatch to complete the work given the poor weather conditions at that time (R. at 41–42, 98–99, 106, 203–04, 219–220).

18. MAP filed an affidavit of commencement of drilling operations on December 26, 1984 with the Harper County Register of Deeds. The affidavit was dated December 21, 1984. It indicates that MAP will commence operations for the drilling of a test well on December 22, 1984 (Exhibit Q).

19. C.D. Williams talked to Jim Hershberger, who was associated with Petroleum Energy, Inc. (PEI) (Hershberger deposition, p. 5–6), in the fall of 1984 concerning the Williams 15–1B site (R. at 141). After discussions with Mr. Hershberger and Dyrk Dahl, Mr. Williams entered into the lease with PEI (R. at 151). The terms of the lease were agreed upon on December 27, 1984 and signed on December 28, 1984 (R. at 153).

20. Mr. Williams relied on the advice of Mr. Hershberger that the 1979 lease expired on December 26, 1984 because of the failure of MAP to have a drilling rig on the premises and drilling before that date (R. at 170, 317–319).

21. PEI obtained a restraining order from the Harper County, Kansas District Court on January 2, 1985 enjoining MAP from further work at the 15–1B site. The case was later removed to this court (Doc. 1).

22. As a result of the restraining order, ED & E was unable to complete its work at the 15–1B site, and MAP had to move the rig off of the site (R. at 47–48).

### CONCLUSIONS OF LAW

A. Is the 1979 lease enforceable and superior to the 1984 lease?

The key issue is whether or not MAP commenced drilling a well under the terms of the 1979 lease before the expiration of the lease. Under the lease, MAP had until the end of the day of December 25, 1984 to commence drilling. According to the lease, drilling operations shall be deemed to be commenced when the first material is placed on the leased premises or when the first work, other than surveying or staking the location, is done thereon which is necessary for such operations, and the lessee proceeds with reasonable diligence and dispatch to drill the well to completion.

In the case of *Richardson v. Northwest Central Pipeline Corp.*, 241 Kan. 752, 757, 740 P.2d 1083 (1987), the Kansas Supreme Court set forth the following rule to govern oil and gas leases:

> Among the familiar rules governing the construction of oil and gas leases are these: the intent of the parties is the primary question; meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof.

In applying the above rules of construction to drilling operations clauses, courts have focused attention on two factors: (1) preliminary steps taken by the lessee toward commencing to drill the well, and (2) the lessee's due diligence in pursuing completion of the well. *A & M Oil, Inc. v. Miller,*

11 Kan.App.2d 152, 154, 715 P.2d 1295 (1986).

In Kansas, a handful of cases have addressed the issue of commencement. *See A & M Oil, Inc. v. Miller,* 11 Kan.App.2d 152, 715 P.2d 1295; *Herl v. Legleiter,* 9 Kan.App.2d 15, 668 P.2d 200 (1983); *Shoup v. First National Bank of Hays,* 145 Kan. 971, 67 P.2d 569 (1937); *Phillips v. Berg,* 120 Kan. 446, 243 P. 1054 (1926); *Hennig v. Wichita Natural Gas Co.,* 100 Kan. 255, 164 P. 297 (1917). In 3 Williams, *Oil and Gas Law,* § 618.1 (1990), the author indicates:

> Although there is some limited authority to the contrary, in general it appears that the courts have been ready to find the commencement of operations (or the pursuit of drilling operations) where only the most modest preparations for drilling have been made.... Such operations must be part of a good-faith effort to obtain production, however, and such operations, once commenced, must be pursued with reasonable diligence if they are to be described as involving the "commencement of drilling operations" or as "drilling operations."

> In brief, drilling operations may be described as any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil and gas well, and by the actual operation of drilling in the ground.

Likewise, in 2 Summers, *The Law of Oil and Gas,* § 349 (1959), the author indicates that as to a commencement clause:

> The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well,

constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease.

Numerous courts have held that there has been commencement of drilling operations when the lessee has begun preparatory work prior to the actual drilling of a well on the site by the last day of the primary term of the lease, and the lessee has proceeded or planned to proceed with reasonable diligence thereafter to drill the well. *See, e.g., Stoltz, Wagner, & Brown v. Duncan,* 417 F.Supp. 552, 561–64 (W.D.Okla. 1976); *Breaux v. Apache Oil Corp.,* 240 So.2d 589, 590–591 (La.App.1970); *Hilliard v. Franzheim,* 180 So.2d 746, 747–749 (La. App.1965); *Jones v. Moore,* 338 P.2d 872, 874–876 (Okla.1959).

In the case of *Herl v. Legleiter,* 9 Kan. App.2d at 15–18, 668 P.2d 200, the court upheld the decision of the trial court that making preparations to drill (i.e., construction of an access road, staking the location, construction of pits at the site and delivery of mud to the well site and of stem and casing pipe to a location accessible to the site) does not constitute commencement of drilling where the lessee neither owns a drilling rig, nor has one under contract, nor has made any arrangements to get one by the last day of the primary term of the lease. *Herl* can be distinguished from the cases cited in the previous paragraph because in *Herl,* unlike the above cases, the lessee had made no arrangements to get a drilling rig by the last day of the primary term of the lease. The court in *Herl* did indicate in dicta that prior Kansas cases concerning commencement suggest that something less than actual drilling might be sufficient to satisfy a commencement clause. *Herl,* 9 Kan.App.2d at 18–19, 668 P.2d 200.

■ In this case, the dirt contractor began to prepare the site for drilling on December 22, 1984. The dirt contractor worked every day thereafter, except for Christmas and New Year's, to prepare the site. Prior to the expiration of the primary term of the lease, MAP had arranged with a drilling contractor to perform drilling operations at the site, even though the drill-

**1426**

ing contractor was unable to begin work until after the expiration of the primary term of the lease (the drilling rig was at the site on December 30, 1984, and drilling operations commenced on January 3, 1985). MAP had further attempted unsuccessfully to find another drilling contractor to begin work sooner at the site. The contractors worked with diligence and dispatch to complete the work given the poor weather conditions. On these facts, the court finds that MAP had commenced drilling operations before December 26, 1984, as defined by the terms of the lease and in accordance with prevailing case law. Therefore, the court finds that the 1979 lease is enforceable and superior to the 1984 lease. The court further finds that Williams breached the 1979 lease by entering into the 1984 lease with PEI.

The next issue before the court is the issue of damages. MAP seeks as damages the lost profits, or, in the alternative, the expenses for development and preparation of the Williams 15–1B site.

■ The rule as to the measure of damages for breach of contract is the same in drilling contracts as it is in other contracts. *Denman v. Aspen Drilling Co.*, 214 Kan. 402, 404, 520 P.2d 1303 (1974). A party injured by a breach of contract is entitled to recover all his damages, including gains prevented as well as losses sustained, provided they are certain and follow from the breach. A party can recover lost profits if the lost profits can be established with reasonable certainty. Absolute certainty is not required to prove lost profits. What is required is that the court or jury be guided by some rational standard. The evidence necessary to establish lost profits with reasonable certainty depends in large measure upon the circumstances of the particular case. However, the claimant must furnish the best available proof as to the amount of loss that the particular situation warrants. *Vickers v. Wichita State University*, 213 Kan. 614, 618–20, 518 P.2d 512 (1974). Damages cannot be awarded when they are too conjectural and speculative to form a sound basis for measurement.

*Johnson v. Baker*, 11 Kan.App.2d 274, 276–77, 719 P.2d 752 (1986).

The only evidence of lost profits in this case consisted of the testimony of Mitzi Salinas, who was secretary to the operations manager of MAP in 1984 (R. at 232). She testified about the oil and gas production of two "nearby" wells. She further testified that she did not know whether or not the Williams 15–1B well would be a producing well (R. at 259).

■ No Kansas case has addressed the issue of what evidence is required to show lost profits on an undrilled oil and gas well. However, one Texas case has addressed this issue. In the case of *County Management, Inc. v. Butler*, 650 S.W.2d 888, 889–890 (Tex.App.1983), the court stated as follows:

> Proof of loss involving undrilled wells, lost leases, and royalties are, by their very nature, difficult to show. Nevertheless, before a plaintiff can recover damages, he must prove with reasonable certainty the damages he suffered from the defendant's breach. [citations omitted] When lost profits are sought as an element of damages, the plaintiff must necessarily show what those profits would have been. [citations omitted] The plaintiff can satisfy this burden through the introduction of evidence showing the initial and continued production of wells drilled on the lands in controversy (if available) and on other lands in the area. [citation omitted] A qualified expert witness should then be produced who, after examining the logs and other relevant information from the surrounding wells, gives an opinion as to the probability of obtaining production and the extent of such production on the land in question. [citations omitted] "Such matters as production costs, geological trends, proration, kind and quality of the oil and countless other items," where applicable, should also be referred to by the expert in making his opinion. [citation omitted].

The court finds that this standard for proving lost profits on an undrilled oil and/or gas well is entirely consistent with the case

law in Kansas on proving lost profits with reasonable certainty. The *Butler* standard would provide the best available proof as to lost profits for an undrilled well.

█ The evidence provided by MAP clearly fails to meet the standard of proof set forth in *Butler,* and falls far short of establishing a loss of profits with reasonable certainty. The only evidence offered by MAP is that of a secretary who simply provided information on how nearby wells performed. Such information provides no reasonable guidance to the trier of fact on lost profits on an oil and gas well. On evidence such as that offered by MAP in this case, the trier of fact is left to speculate on whether the well would produce, and if so, how much oil and/or gas would be produced from the well. Such evidence certainly falls far short of providing the best available proof as to lost profits on an oil and/or gas well. The court therefore finds that MAP has failed to prove a loss of profits.

█ In the alternative, MAP seeks damages for the expenses for the development and preparation of the Williams 15–1B site. However, a fundamental principle of damages for breach of contract is that the injured party should be placed in the same position that he would have occupied if the contract had been performed. A party is not entitled to be placed in a better position than full performance by the other party would have placed him. *M & W Development, Inc. v. El Paso Water Co., Inc.,* 6 Kan.App.2d 735, 738, 634 P.2d 166 (1981). In other words, the party should not be placed in a better position than he would have been in if the breach had not occurred. The expenses incurred by MAP would have been incurred by MAP regardless of whether or not the lease was breached. If there had been no breach of contract, MAP would have either deducted those expenses from any profits it realized from the well, or would have had to absorb those expenses if the well turned out to be a dry hole. MAP cannot be put in a better position because of the breach by awarding them damages for those expenses. If MAP had shown evidence of expenses it incurred because of the breach, then MAP would have been entitled to recovery for those damages. However, MAP provided no evidence of damages it suffered because of the breach. All of the damages alleged by MAP would have been incurred regardless of the breach. Therefore, MAP is not entitled to damages for the expenses incurred to develop and prepare the Williams 15–1B site.

One final issue remains to be resolved. In the final pretrial order, MAP asks that the court find that the 1979 lease be continued in force and effect for such reasonable time so as to allow completion of the Williams 15–1B well. That order was filed in 1985, prior to one of the parties filing for bankruptcy, which delayed the trial in this case. However, MAP's proposed findings of fact and conclusions of law do not request that the 1979 lease be continued in force to allow completion of the well. While the court asked counsel to address whether this remedy was still sought in a supplemental brief, the supplemental brief of MAP does not clearly indicate whether this remedy is sought. The court will note that an employee of MAP did testify at the trial that MAP was not seeking a declaration that MAP still held a current and valid lease for the Williams 15–1B site. However, the court does not deem such testimony binding on MAP. The court has already found that the 1979 lease is valid and enforceable, and can see no reason why MAP would not be entitled to resume operations at the Williams 15–1B site so long as they commenced to drill pursuant to the terms of the lease. The court will allow MAP until October 28, 1991 to notify the court by a pleading whether it still seeks this remedy.

B. Did defendant Williams breach the warranty of title and the covenant of quiet enjoyment by granting the 1984 lease to PEI and by not defending MAP's title?

█ The 1979 lease provides that: "Lessor hereby warrants and agrees to defend the title to the lands herein described ... (Exhibit A)." The covenants of warranty and quiet enjoyment are mainly iden-

tical. Both covenants relate to the possession and assure quiet enjoyment of the estate conveyed. To constitute a breach, it is generally held that there must be not only a disturbance of possession, but the eviction must be under an adverse and paramount title *which existed when the covenant was made* (emphasis added). *Wilder v. Wilhite*, 190 Kan. 564, 566, 376 P.2d 797 (1962); *Bedell v. Christy*, 62 Kan. 760, 763, 64 P. 629 (1901). In other words, these covenants would only protect a lessee from an eviction under a paramount title which existed at the time the lease was signed. MAP was not evicted as a result of an assertion of a paramount title which allegedly existed at the time the 1979 lease was signed. MAP was evicted under the terms of a 1984 lease entered into between Williams and PEI when the two latter parties believed that the 1979 lease had expired. It would be illogical for the law to require that a lessor be required to defend the lease of a lessee when the lessor believes that the lease with the lessee has expired and he leases the land to a second lessee. Because there was no eviction under an alleged paramount title which existed at the time the 1979 lease was signed, MAP has no cause of action for breach of the covenants of warranty or quiet enjoyment. Because MAP seeks attorney's fees under the breach of these covenants, their request for attorney's fees is denied. *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814, 817 (1988).

C. Have defendants Williams and PEI slandered the title of MAP?

■ Slander of title is defined as a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury. *Safety Federal Savings and Loan Ass'n v. Thurston*, 8 Kan.App.2d 10, 13, 648 P.2d 267 (1982). *See Brown v. Kelly*, 545 So.2d 518, 520 (Fla.Dist.Ct.App.1989); *Davitt v. Smart*, 449 N.W.2d 378, 379 (Iowa 1989). MAP contends that the execution of the 1984 lease between Williams and PEI constituted slander of title because it is a false written statement made

with the intention to deprive MAP of its leasehold interest.

■ Malice is an element of the cause of action. Malice, as required in a slander of title action, requires a showing of lack of good faith and absence of probable cause. *Reed Road Associates v. Campbell*, 400 Pa.Super. 119, 582 A.2d 1373, 1374 n. 2 (1990); *Davitt v. Smart*, 449 N.W.2d at 380; *Hamilton v. Amwar Petroleum Co., Inc.*, 769 P.2d 146, 149 (Okla.1989). Other courts have defined malice in a slander of title action to constitute publication of the matter with the knowledge that it is false or with reckless disregard as to whether it is false or not, *Morris v. G. Rassel, Inc.*, — Ind.App. ——, 576 N.E.2d 596 (1991), and that malice requires a showing of an intent to injure. *Stanton v. Dachille*, 186 Mich.App. 247, 463 N.W.2d 479, 486 (1990); *Peckham v. Hirschfeld*, 570 A.2d 663, 667 (R.I.1990); *Jack B. Parson Companies v. Nield*, 751 P.2d 1131, 1134 (Utah 1988). After reviewing the evidence, the court finds that Williams and PEI signed the 1984 lease in the good faith belief that the 1979 lease had expired. The court finds that Williams and PEI did not sign the 1984 lease with knowledge of, or reckless disregard of, the fact the 1979 lease was still valid. While they were or should have been aware that work had begun at the Williams 15–1B site prior to the expiration of the primary term of the lease, the court cannot say that their belief the work did not constitute commencement of drilling operations under the terms of the lease was in bad faith or absent probable cause. In the absence of a showing of malice, the court holds that MAP has not sustained its burden of proof on the claim of slander of title. Furthermore, even if MAP had shown slander of title, they have failed to show that they were damaged by the slander, and therefore would still not be entitled to recovery.

D. Did Williams and PEI conspire to deprive MAP of its leasehold interest?

■ The five elements of a civil conspiracy are: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of

the minds in the object or course of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result thereof. *State ex rel. Mays v. Ridenhour,* 248 Kan. 919, 927, 811 P.2d 1220 (1991). The action for civil conspiracy must be supported, as one its elements, by one or more unlawful acts which produce an unlawful result. *Stoldt v. City of Toronto,* 234 Kan. 957, 967–68, 678 P.2d 153 (1984). Kansas law requires an actionable tort independent of the alleged conspiracy to maintain a claim. *Hokanson v. Lichtor,* 5 Kan.App.2d 802, 808, 626 P.2d 214 (1981). The only cause of action upon which MAP has prevailed in this case is for the breach of the 1979 lease. MAP has not demonstrated any unlawful, tortious act by Williams or PEI. Furthermore, MAP has failed to prove damages. Therefore, MAP has failed to demonstrate a civil conspiracy because of their failure to establish the fourth or fifth elements of the cause of action.

**E. Did PEI trespass on the Williams 15–1B site?**

A trespasser is a person who intentionally enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise. *Riddle Quarries, Inc. v. Thompson,* 177 Kan. 307, 311, 279 P.2d 266 (1955). In a trespass action, damages may be awarded for any injury which is the immediate consequence of the trespass. *Mackey v. Board of County Commissioners of Johnson County, Kansas,* 185 Kan. 139, 147, 341 P.2d 1050 (1959).

This court has already held that the 1979 lease was valid. However, the only action taken by PEI was to file this case, asserting that the 1984 lease was valid, and to eject MAP from the Williams 15–1B site. The court can find no authority for the proposition that such action constitutes a trespass. Even if a trespass had occurred, the court, for the reasons already noted, finds no damages for the trespass have been proven.

**F. Did PEI engage in tortious interference with a contract or a prospective business advantage?**

Tortious interference with a contract consists of the following elements: (1) the existence of a contract between the plaintiff and a third party; (2) actual or constructive knowledge of the contract by the defendant; (3) intentional acts by defendant inducing the third party to breach the contract with plaintiff; (4) such acts constituting the proximate cause of the breach; and (5) damages suffered by plaintiff as a direct result of defendant's actions. Malice is a necessary requirement. *V.C. Video, Inc. v. National Video, Inc.,* 755 F.Supp. 962, 970–71 (D.Kan.1990). Tortious interference with a prospective business advantage or relationship consists of the following elements: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct. *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986). Both torts are predicated on malicious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, tortious interference with a contract is aimed at preserving existing contracts and tortious interference with prospective business advantage is aimed at protecting future or potential contractual relations. *Id.*

Regardless of which theory is being relied on by MAP, the court finds no malicious conduct by PEI. The court finds that the evidence does not demonstrate that PEI acted with malice, that is, the court finds that PEI did not induce Williams to sign the 1984 lease intending to harm MAP without a reasonable justification or excuse. The pleadings filed when PEI initiated this case indicates to the court a good faith belief by PEI that the

**1430**

1984 lease was valid. Finally, the court finds that MAP has failed to prove that they were damaged by the actions of PEI, even if they were tortious.

IT IS THEREFORE ORDERED that the 1979 lease is found to be enforceable and superior to the 1984 lease. MAP shall file a pleading with the court by October 28, 1991 indicating whether they wish to have the 1979 lease continued in force and effect in order to allow for completion of the Williams 15–1B well.

IT IS FURTHER ORDERED that Williams breached the 1979 lease by signing the 1984 lease with PEI. However, the court finds that MAP failed to prove that they were damaged by the breach of the lease.

IT IS FURTHER ORDERED that as to the remaining causes of action asserted by MAP against Williams and/or PEI, the court finds in favor of Williams and/or PEI on each cause of action, for the reasons set forth by the court in this opinion.