G. M. WALDRIP et al., Plaintiffs,

v.

Jake L. HAMON et al., Defendants.

Civ. No. 3652.

United States District Court
E. D. Oklahoma.

Nov. 18, 1955.

Fischl & Culp, Ardmore, Okl., for plaintiffs.

George N. Otey, Ardmore, Okl., for defendants.

WALLACE, District Judge.

The plaintiffs instituted this suit urging four causes of action in connection with certain mineral interests owned by plaintiffs and presently leased to defendant Hamon.[1] Plaintiffs ask: (1) for damages due to Hamon's breach of contract with plaintiffs, G. M. and Helen E. Waldrip, husband and wife, wherein Hamon promised to either drill to the Humphreys Sands or assign the 20 acres to one willing to so drill; (2) for damages because of alleged drainage by a northwest diagonal offset in which Hamon has an interest; (3) that Hamon be required to comply with the Waldrip agreement and either assign or release the controverted Humphreys Sands; and, (4) for a release of the entire 40 acres as to all formations 200 feet below the Humphreys Sands because of Hamon's failure to complete a well in the Goodwin Sand.

Previously, this court ruled that defendant Hamon did breach his agreement with the Waldrips in refusing to assign "to the Humphreys Sands" after failing himself to drill within the prescribed time.[2] However, such ruling did not propose to deal with the relief to be granted because of such breach, with the alleged failure of Hamon to protect the 20 acres from drainage, or with plaintiffs' claim as to the entire 40 acres asserted in the fourth cause of action.

 Although all the mineral owners of the 40 acres in question have been joined as parties plaintiff, the claims for relief originate in the contract between the Waldrips and defendant Hamon. Inasmuch as there is no privity of contract between defendant Hamon and the "other plaintiffs" (that is, other than the Waldrips) these other plaintiffs have no standing to seek recovery based upon al-

---

1. This controversy involves the NW/4 of the SW/4 of Section 10, Township 2 South, Range 3 West, Carter County, Oklahoma. The first three causes of action deal with the 20 acres compos-ing the W/2 of the just described 40 acres; whereas, the fourth cause of action deals with the entire 40.

2. Opinion reported at 128 F.Supp. 4.

leged breaches of the Waldrip-Hamon contract, and modifications thereto. Hamon's liability for breaching this contract must be measured by the detriment suffered by the Waldrips, the promisees under the contract.[3]

Although the Waldrips' monetary loss because of the breach cannot be determined to the precise dollar the evidence does enable the court to assess with reasonable accuracy the extent of such loss inasmuch as the expert testimony and documentary evidence establishes with convincing certainty the approximate number of barrels of oil recoverable by primary methods from the Humphreys Sands under the 20 acres in question. The principle that where damage is certain, recovery should not be denied because of difficulty in determining the exact amount of the damage is peculiarly applicable here.[4]

Plaintiffs' evidence indicates that of the 20 acres in question 3.17 acres contain recoverable oil.[5] In addition, such evidence establishes that the net depth of these sands is 41 feet; and, that the sands contain some 125 barrels per acre foot.[6] Thus, from Waldrip's own testimony it is inferable that had the controverted well been drilled, the Waldrips' interest would have amounted to about 1116 barrels.[7] However, in calculating the monetary loss suffered by the Waldrips because the instant well was not drilled consideration must be given the fact that the evidence also shows that the "Waldrip No. 1" offsetting to the east will recover approximately 25% of the oil underlying the 20 acres in question.[8] Inasmuch as the Waldrips have the same fractional royalty interest in the "Waldrip No. 1" as held in the 20 acres in question, the increased produc-

---

3. As mentioned in 23 Okl.Stat.1951 § 21: "For the breach of an obligation arising from contract, the measure of damages, * * * is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. * * *"

4. As stated in Brown v. Homestake Exploration Corporation, 1934, 98 Mont. 305, 39 P.2d 168, 178: "The general rule is that, where the cause and existence of damages has been established with requisite certainty, recovery will not be denied because such damages are difficult of ascertainment." (Citing authorities.) As observed in General Finance Corporation et al. v. Dillon, 10 Cir., 1949, 172 F.2d 924, 930: "It is also well settled that the amount of damages resulting from such a breach must be ascertainable with some degree of certainty and may not be based on mere speculation and conjecture alone. But when a breach of a contractual obligation with resulting damage has once been established, the mere uncertainty as to the exact amount of damages will not preclude the right to a recovery. *In such cases it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference although the result may be only approximate. * * *"* (Emphasis supplied.)

5. Mr. Fienning, plaintiffs' expert witness, testified that in his best judgment only 3.17 of the 20 acres in controversy "is above the oil-water contact and contains oil." See, in particular plaintiffs' exhibit 3.

6. Thus, making a total of 16,246 barrels recoverable by primary methods.

7. That is, 11/20 x 1/8 x 16,246.

8. As testified by Mr. Fienning: "Q. Now I believe you did say that some of it might be recovered by the Waldrip Number 1? A. Yes.
"Q. By the Hamon Number 1 Waldrip; allowing for that, what is your opinion, best opinion as to how much of it would not be recovered? A. I'd say the biggest portion of it wouldn't be recovered because what it will do is the gas expansion of the oil that's under this lease will probably aid in producing additional oil under the ten acres in which the Hamon Number 1 Waldrip is located. It will, that is I think that's the way most of it would be.
"Q. How much of it now in your opinion would not be recovered that is under this 20 acres, if it isn't drilled? A. I think the biggest portion of it would not be recovered.
"Q. What percentage would you say? A. I think 75% or better."

tion to be gained by the "Waldrip No. 1" because of the failure to drill the controverted well must be subtracted from the oil which would have been recovered for the Waldrips from the proposed but undrilled well in order to arrive at the actual net loss suffered by the Waldrips because of the instant breach of contract. Such subtraction indicates the Waldrips suffered a net loss in barrels of oil of about 837.

In determining the Waldrips' loss resulting from the breach in question, the court has not overlooked plaintiffs' argument that the proper measure of damage should be the cost of drilling a well on the site in question to the agreed upon depth. Although plaintiffs cite authorities from Oklahoma wherein the "cost of the well" was determined to be the proper measure of damage for failure to drill an agreed upon well,[9] such authorities are inapplicable to the case at bar. Where the courts have applied such a norm two basic conditions have existed. First, the breached contracts were ones wherein there was an *unconditional* promise to drill specific wells, with the drilling of a well, or wells, the paramount object in view.[10] Secondly, the cost of the well appeared to be the most logical rule to apply to determine the exact extent of the loss of the promisee because of the breach.[11]

In the case at bar, Hamon did not unconditionally promise, as an operator, to drill a well for the Waldrips. His promise was conditioned upon a self-determination of whether such a well would be profitable with an alternative of assigning or releasing the acreage in question if in his judgment such a well would not prove profitable. It is clear, that insofar as the Waldrips were concerned the object of the contract was to gain production from the sands in question, with the drilling of a well merely being the means to secure that end result. Nothing inheres in the controverted agreement pointing to a desire to obtain an exploratory well for testing of the structure or proving or disproving a certain general area, or other considerations which may enter into a promisee's desire to contract for the drilling of a specific well, or wells. And, where as in the instant case taking plaintiffs own figures of likely primary recovery, there would be no logic in arbitrarily using the cost of drilling a well as the basis for recovery where a more accurate means of determining the financial consequence of the promisor's breach is available.[12] A different situation exists where it is absolutely impossible to determine whether

---

9. See Ardizonne v. Archer, 1919, 72 Okl. 70, 178 P. 263; Smith v. Kious, 1944, 194 Okl. 17, 147 P.2d 442; Newman v. Roach, 1925, 111 Okl. 269, 239 P. 640; Eysenback v. Cardinal Petroleum Co., 1925, 110 Okl. 12, 236 P. 10; and Lorraine Petroleum Co. v. Bartlett, 1929, 138 Okl. 8, 280 P. 286.

10. For example, as mentioned in Lorraine Petroleum Co. v. Bartlett, fn. 9, supra, 280 P. at page 288: " * * * Under the evidence the well was to be a *test* well, and the primary purpose for drilling it was to ascertain whether oil or gas could be found, and the costs of drilling such a well would certainly be compensatory in its nature to plaintiff for the detriment caused by the failure to drill the well * * *." (Emphasis supplied.) Significantly, in the Lorraine Petroleum Co. case, the contract between the parties specifically provided that $10,000 was the agreed upon damages in case of a failure to drill.

11. As noted in Eysenback v. Cardinal Petroleum Co., fn. 9, supra, 236 P. at page 12: " * * * and the fact that conditions changed, or the defendant changed his mind as to the likelihood or probability of discovering oil or gas, is of no concern, the plaintiff had paid the defendant by reason of the assignment of the leases to drill the wells, and in the event of his failure to comply with the terms of the contract, he should respond in damages in such amount as the drilling of the wells would cost. *As shown by the evidence, this is the only measure of damages that is direct and capable of computation.* * * * " (Emphasis supplied.)

12. "The fundamental principle of the law of damages being compensation for the injury sustained, the plaintiff in a civil action for damages cannot, except in the cases in which punitive damages may be recovered, hold a defendant liable in

the well not drilled would have been dry or a tremendous producer. Under such circumstances the "cost of the well" is the best, if not the only means of judging the damage resulting from the breach. However, inasmuch as the "cost of the well" recovery is in essence an award of liquidated damages, not looked upon with favor by the law, an approximation of the true damage to the promisee should be used where as in the case at bar such a determination can be made with a reasonable degree of certainty.

Although plaintiffs introduced evidence going toward the possible *secondary* recovery of barrels of oil from the controverted 20 acres had a well been drilled, such evidence is entirely too speculative upon which to pitch a monetary award.[13] Many contingencies enter into any attempt for secondary recovery;[14] and, in determining the loss suffered by the Waldrips because of the instant breach the allowed damages must be based upon probability and not merely conjecture or possibility.

■ Although the bases of all the plaintiffs' causes of action are founded in the Waldrip-Hamon contract, the court has also considered whether in light of the introduced evidence the "other plaintiffs" have established a right to recover for drainage based upon the breach of an implied covenant running between the "other plaintiffs" and Hamon. The evidence fails to disclose any such right. Although, doubtless, the "Haas No. 2" (a 10-acre diagonal offset to the northwest) and "the Pickens-Williams No. 4" (a 10-acre diagonal offset to the northeast) will probably benefit from added bottom hole pressure due to the absence of a well to the Humphreys Sands on the controverted 20-acres; nonetheless, the evidence is convincing that these two offsets have not and will not produce oil drained from this 20 acres. The only well which is draining the sands in question is the "Waldrip No. 1" (located to the east) and inasmuch as the plaintiffs own the same fractional interest therein as in the 20-acres in question, plaintiffs can show no damage.

■ There is nothing in the contract between the Waldrips and Hamon which at this time requires Hamon to release or assign "all formations two hundred (200) feet below the Humphreys Sands" on the 40-acres as requested in plaintiffs' fourth cause of action. Although the last sentence of Paragraph 5 of the "Modification of Contract" when read out of context appears to require such a release or assignment if Hamon did not *complete* a well in the Goodwin Sand, a reading of the entire contract and modification thereto demonstrates that the relied upon Paragraph 5 never came into operation. Such provision was only to be applicable if Hamon in drilling the first

---

damages for more than the actual loss which he has inflicted by his wrong. In other words, one injured by the breach of a contract * * * is entitled to a just and adequate compensation for such injury, but no more. His recovery is * * * limited to a fair compensation and indemnity for the injury which he suffered. The law will not put him in a better position than he would be in had * * * the contract not been broken. * * *" 15 Am.Jur. § 13, p. 402.

13. As indicated during the cross-examination of plaintiffs' geologist: "Q. But that's all a matter of conjecture. You don't as a matter of fact, there has been no established figures on secondary recovery measures in the Springer formation, have there? The biggest one, is it not, is Sholom Alechem Block and that hasn't gone into effect yet? A. That's right.

"Q. In other words, there has been no actual experience with respect to secondary recovery measures in the Springer? A. There hasn't been any to date."

14. In Stanolind Oil & Gas Co. v. Sellers, 10 Cir., 1949, 174 F.2d 948, 956. Judge Huxman in dealing with evidence touching upon secondary recovery remarked: "The fallacy of this testimony is apparent upon its face. The percentage of an estimated pool recovery under a unitized operation assigned to a particular lease represents at best only an estimated contribution from that tract under a single unitized operation. Without more, it cannot be taken as evidence of the estimated recovery therefrom under an independent, individual operation of the lease. * * *"

well failed to test or "drill to" the Goodwin Sands. When Hamon drilled the first well (the Waldrip No. 1) such hole was drilled to the Goodwin Sand and carefully tested. Such being done, no rights under Paragraph 5 accrued to the Waldrips. If Hamon had not drilled down to the Goodwin Sand when drilling the "Waldrip No. 1"; and had the Waldrips then procured a person willing to test such sand, Paragraph 5 would have come into effect, thereby making it incumbent upon Hamon to either complete the second well in the Goodwin or release the Goodwin Sand.

It is the conclusion of the court that the Waldrips under their first cause of action are entitled to a money judgment in the sum of $2427.30, the amount in dollars lost by Waldrips because of Hamon's failure to drill a well to the Humphreys Sands on the 20 acres in question, or assign to one willing to so do.[15]

Within 15 days counsel should submit a journal entry which conforms with this opinion.

---

15. This figure is arrived at by taking 837 (the number of barrels lost by the Waldrips because of the instant breach) and multiplying it by $2.90 (the going price of oil at the time of trial). Obviously, such a formula does not establish the exact loss in the instant case; however, such does supply a rational basis from which the approximate damage can be determined.