916 P.2d 822

**STRATA PRODUCTION COMPANY,**
a New Mexico corporation,
Plaintiff–Appellee,

v.

**MERCURY EXPLORATION COMPANY,**
a New Mexico corporation,
Defendant–Appellant.

No. 22273.

Supreme Court of New Mexico.

April 15, 1996.

Atwood, Malone, Mann & Turner, P.A., Steven L. Bell, Richard J. Valle, Roswell, for Appellant.

Stratton & Cavin, P.A., Harold D. Stratton, Jr., Sealy H. Cavin, Jr., Albuquerque, Browning & Peifer, P.A., James O. Browning, Albuquerque, for Appellee.

## OPINION

FROST, Chief Justice.

Defendant–Appellant Mercury Exploration Co. (Mercury) appeals from a judgment rendered in favor of Plaintiff–Appellee Strata Production Co. (Strata) for breach of contract and negligent misrepresentation. Mercury argues on appeal that: it modified its unilateral contract offer with Strata before Strata's acceptance by performance; the trial court incorrectly interpreted the contract terms; the trial court failed to reduce Strata's damage award by the proportionate interests owned by subsequent investors; and the trial court used the incorrect measure of damages for calculating Strata's lost profits for breach of the contract. We affirm.

## I. FACTS

Both Strata and Mercury are engaged in the business of petroleum exploration and production. In 1991 Strata began putting together a drilling prospect in Lea County, New Mexico, which it called the Red Tank Prospect. As part of the Red Tank Prospect, Strata obtained farmout agreements from Exxon Co., Mobil Producing Texas and New Mexico Inc., and Mercury for drilling rights on three tracts of roughly adjacent land. These tracts are named the Cercion tract, the Paisano tract, and the Lechuza tract, respectively. The Mercury farmout agreement for the Lechuza tract is the contract at issue here.

A farmout agreement is an assignment of a lease and drilling rights by a lease-owner not interested in drilling to another operator interested in drilling. 8 Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* 389 (1995). The primary characteristic of a farmout agreement is that the assignee is obligated to drill one or more wells on the assigned acreage as a prerequisite to the completion of the assignment. 8 *id.*

Strata and Mercury entered into their farmout agreement effective August 28, 1991. Glenn Darden, a vice president of Mercury, drafted the farmout agreement. In the farmout agreement, Mercury represented that it owned or controlled all of the lease covering the Lechuza tract. The farmout agreement provided in relevant part that upon initiation of drilling a test well to a specified depth within 120 days of entering the agreement, Mercury would assign to Strata 100% of the working interest in the lease. Mercury also stated in the farmout agreement that it would assign to Strata a net revenue interest of 76.5% of the total revenue interest in the leased land.[1] Under the terms of the lease Mercury subdivided the Lechuza tract into four 40–acre parcels

---

1. The working interest is the right to exploit the oil and gas in the leased land. Working interest owners are entitled to a proportionate share of profits from the oil extraction but are responsible for paying the costs of that extraction. 8 Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* 1225 (1995). A grant of 100% of the working interest gives the lessee the exclusive right to exploit the minerals in the land. *See generally* 8 *id.*

The net revenue interest is the interest the assignee of a lease actually has in the profits of the oil-production operation free of production costs after all overriding royalties have been paid out to the prior leaseholders. 8 *id.* at 681–82.

For example, if A transfers her lease to B but reserves a one-eighth (12.5%) royalty, and B subsequently transfers one-quarter (25%) of his interest in the lease to C, then A owns no working interest but has a 12.5% net revenue interest, B owns 75% of the working interest but only 65.6254% of the net revenue interest, and C has a 25% working interest and a 21.875% net revenue interest. *See* 8 *id.* at 1226 (setting out same example). Thus, B and C together have the exclusive right to exploit the minerals from the leased land, but they are responsible for all the costs of production in proportion to their respective working interests. On the other hand, A, B, and C divide the profits according to their respective net revenue interests.

arranged in a checker-board pattern, and Strata could earn Mercury's lease rights for each parcel by successively drilling test wells on the respective parcels. Finally, a clause in the agreement noted that the agreement was on an option basis with no penalty for failure by Strata to drill the test wells other than termination of the agreement. Strata paid no consideration to Mercury for this farmout agreement.

On October 1, 1991, Strata entered into a participation agreement with twenty-four investors. Under this participation agreement, Strata sold to the investors a proportionate share of its working interest in the leases in exchange for proportionate contributions to pay for the capital outlays necessary to begin drilling. Strata ultimately retained only 1.5% of its original working interest acquired from Mercury. The investor with the largest interest was Meridian Oil Production, Inc. (Meridian), which acquired a 50% interest from Strata.

On October 29, 1991, as part of its Red Tank Prospect development, Strata began drilling a well on the Cercion tract pursuant to its farmout agreement with Exxon. This Cercion well was a "wildcat," meaning that it was an exploratory well in an unproven territory and in fact was the first well to produce within the general area of the Red Tank Prospect tract. *See* 8 Williams & Meyers, *supra*, at 1218 (defining wildcat well). As a wildcat, the Cercion well was an extremely risky undertaking, costing approximately $600,000 to drill and complete. On November 5, Strata requested an extension of the 120–day drilling deadline, which would otherwise expire on December 11.

On November 10, 1991, Strata's title attorney, Sealy Cavin, Jr., noticed some discrepancies in a 1982 lease agreement concerning the Lechuza tract which indicated that additional, previously unknown parties might also have a working interest in the Lechuza tract. On November 26 Mercury granted Strata a 30–day extension on the 120–day drilling deadline. Cavin produced a formal drilling title opinion on December 9, 1991, which demonstrated that Mercury did not own 100% of the working interest in the Lechuza tract, nor was it able to transfer a 76.5% net revenue interest in the land which it had promised in the farmout agreement.

Strata promptly began negotiations with the newly discovered parties and was able to procure similar working-interest assignments from all but one party. Ironically, the one newly discovered party that would not transfer its 17.1875% working interest in the Lechuza tract was Meridian, which was already a 50% investor in Strata's drilling consortium as noted above. Meridian apparently was not aware that it had this 17.1875% interest when it entered into the participation agreement with Strata.

In addition, another party, Ann Hudson, was unwilling to transfer a full 76.5% net revenue interest from her share and instead retained a larger royalty for herself. This retention resulted in an additional shortfall of 2.033258% net revenue interest below the 76.5% net revenue interest Mercury promised to assign, entirely apart from the missing 17.1875% working interest that Mercury was unable to transfer.

Strata completed the Cercion well and put it into production as a commercial well in December 1991. The location and success of the first Cercion well indicated that the Lechuza tract would also generate commercially productive wells. Strata then requested an additional 30–day extension beyond the January 11, 1992, deadline for commencing drilling under the Mercury farmout agreement, which Mercury refused. Strata therefore commenced drilling on the first 40–acre parcel of the Lechuza tract on January 10, 1992, and completed the well in early February 1992. Strata subsequently drilled wells on two of the three remaining 40–acre parcels, thereby earning the lease assignments for those parcels under the Mercury farmout agreement. The first and second Lechuza wells were commercially productive, the third was not.

Strata sued Mercury for breach of contract and negligent misrepresentation for failing to deliver 17.1875% of the working interest and 2.033258% of the net revenue interest for the Lechuza tract wells. After a bench trial, the court found in favor of Strata and awarded damages of $616,555.22. Mercury appeals

from the trial court's findings in favor of Strata and challenges the court's calculation of damages. Because we affirm the trial court's award of damages for breach of contract, we need not address Mercury's claims regarding the tort of negligent misrepresentation.

## II. CONTRACT FORMATION

■ On appeal we will not disturb the trial court's factual findings unless the findings are not supported by substantial evidence. *Hill v. Community of Damien of Molokai,* 121 N.M. 353, 362, 911 P.2d 861, 870 (1996); *Segal v. Goodman,* 115 N.M. 349, 353, 851 P.2d 471, 475 (1993). We are not bound, however, by the trial court's legal conclusions and may independently draw our own conclusions of law on appeal. *Hill,* 121 N.M. at 363, 911 P.2d at 871; *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 510, 817 P.2d 238, 244 (1991).

### A. Mercury's Offer

Mercury first argues that its farmout agreement with Strata was a unilateral contract, which it was free to revoke or modify before Strata's acceptance. Mercury contends that Strata's discovery of Mercury's inability to transfer all of the relevant interests worked an effective modification of its offer in the farmout agreement.

■ The farmout agreement provided for Strata's acceptance by performance, namely drilling a test well to a specified depth on the Lechuza tract. The agreement did not provide for a penalty if Strata failed to drill a test well, except that the agreement would lapse. Strata was not obligated to take any action under the agreement. Accordingly, the farmout agreement was a traditional unilateral contract, in which the offeror makes a promise in exchange, not for a reciprocal promise by the offeree, but for some performance. *See* 1 Joseph M. Perillo, *Corbin on Contracts* § 1.23 (rev. ed.1993) (describing unilateral contracts). In a unilateral contract, the offeree accepts the offer by undertaking the requested performance. Generally, the offeror is free to revoke or revise the offer before acceptance. *See* 1 *id.* § 2.18 (revocability of offers).

■ In this case the farmout agreement expressly provided that it was on an option basis, holding open the underlying unilateral contract offer for 120 days. Ordinarily, an option contract serves to make an offer irrevocable for the stated period of time. However, to be effective, the option contract generally must be supported by some consideration given in exchange for holding the underlying offer open. *See* 1A Arthur L. Corbin, *Corbin on Contracts* § 262 (1963) (discussing option contracts). Strata acknowledges that it did not pay Mercury for this option contract. Accordingly, Strata must demonstrate a substitute for consideration which would serve to make the option contract binding.

### B. Promissory Estoppel

■ Strata argues that it substantially changed its position in reliance on Mercury's offer and that this reliance served as the consideration substitute. In essence, Strata argues that the doctrine of promissory estoppel applies in this case to make the offer irrevocable for the period stated in the option (120 days plus the 30–day extension). We agree.

■ The theory of promissory estoppel provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1) (1981); *see also Eavenson v. Lewis Means, Inc.,* 105 N.M. 161, 162, 730 P.2d 464, 465 (1986) (citing Restatement and discussing elements of promissory estoppel).

■ The leading case applying promissory estoppel in the commercial setting is *Drennan v. Star Paving Co.,* 51 Cal.2d 409, 333 P.2d 757 (1958) (In Bank). In *Drennan* a general contractor relied on a subcontractor's submitted estimate in bidding on a construction project. The contractor was

awarded the general bid, in part based on the low subcontractor estimate. *Id.* 333 P.2d at 758. The subcontractor subsequently discovered that it had miscalculated its estimate and informed the contractor that it was revoking its bid. *Id.* at 759. The trial court granted summary judgment in favor of the general contractor, finding that the subcontractor made a definite irrevocable offer. *Id.* On appeal, the *Drennan* court held that the contractor's reliance on the subcontractor's bid rendered the bid irrevocable even though the subcontractor's offer was not supported by consideration. The court explained:

> Whether implied in fact or law, the subsidiary promise serves to preclude the injustice that would result if the offer could be revoked after the offeree had acted in detrimental reliance thereon. Reasonable reliance resulting in a foreseeable prejudicial change in position affords a compelling basis also for implying a subsidiary promise not to revoke an offer for a bilateral contract.

*Id.* at 760. The same also holds true for a unilateral contract.[2]

■■■ This Court adopted a similar view of promissory estoppel in *Eavenson,* 105 N.M. at 162, 730 P.2d at 465 (holding promissory estoppel applicable to oral promise of employment). In *Eavenson,* however, rather than using the terminology of "prejudicial change in position," we stated that "the detriment suffered in reliance must be substantial in an economic sense." *Id.* This language gives the impression that the promisee's actions must result in an immediate and identifiable economic loss. Unfortunately, this is an inaccurate statement. In fact, to invoke the doctrine of promissory estoppel, it is sufficient that the promisee substantially change its position, that this action was foreseen or foreseeable, and that a promise was made which induced the action or forbear-

ance. 1A Corbin, *supra,* § 200. Finally, "the Restatement justifies enforcement of the promise only 'if injustice can be avoided only by enforcement of the promise.' " 1A *id.* § 200, at 220 (quoting Restatement (Second) of Contracts § 90). To the extent *Eavenson* is to the contrary, it is hereby overruled.

■■■ Accordingly, recasting the definition set out in *Eavenson* to reflect these considerations, the essential elements of promissory estoppel are: (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice. *See* 1A Corbin, *supra,* § 200, at 84–96; 1 Perillo, *supra,* § 2.31; 4 Richard A. Lord, *Williston on Contracts* § 8:5 (1992); Restatement (Second) of Contracts § 90. The theory of promissory estoppel is equally applicable to option contracts otherwise lacking in consideration. *See* 1A Corbin, *supra,* § 263, at 502–03 ("[A]n option contract can be made binding and irrevocable by subsequent action in reliance upon it, even though such action is neither requested nor given in exchange for the option promise.").

Turning to the present case, it is undisputed that Strata began drilling the first Cercion well on October 29, 1991, prior to learning of Mercury's inability to deliver 100% of the working interest and 76.5% of the net revenue interest for the Lechuza tract. The trial court found that Strata drilled the Cercion well as part of its development of the

---

**2.** Promissory estoppel is similar to the doctrine of partial performance of a unilateral contract. In *Marchiondo v. Scheck,* 78 N.M. 440, 442–43, 432 P.2d 405, 407–08 (1967), we explained that partial performance on an offer for a unilateral contract also renders the offer irrevocable. The beginning of performance on an offer for a unilateral contract essentially creates a binding contract with the condition that the offeree complete performance. *Id.; see also* Restatement (Sec-

ond) of Contracts § 45 & cmt. d (1981) (noting that for a unilateral contract offer, partial performance creates a binding option contract with the part performance serving as the consideration). The critical difference between these two theories, however, is that with promissory estoppel, the action or forbearance which renders the offer irrevocable need not be the initiation of performance under the contract.

Red Tank Prospect, which included the Cercion, Lechuza, and Paisano tracts, and that Strata began drilling the well in reliance on the Mercury farmout agreement. Strata also presented evidence that the Cercion tract was part of the same geologic formation as and immediately downslope from the first Lechuza tract, indicating that a commercial strike on the Cercion tract would signify the likely probability of a commercial strike on the first Lechuza tract. Finally, the trial court found that the first Cercion well was an extremely risky wildcat well drilled in a previously untested location.

Accordingly, we conclude there was substantial evidence indicating that Strata reasonably relied on the option for accepting the Mercury farmout agreement without modification. By drilling the high-risk Cercion test well, Strata substantially and foreseeably altered its position. This reliance served to make the option in the farmout agreement irrevocable. Thus at any time prior to January 11, 1992, Strata was free to accept the original, unilateral contract offer simply by undertaking the performance required by the farmout agreement.

Mercury, however, points out that the trial court expressly found the farmout agreement was not an enforceable contract until Strata began drilling the first Lechuza well, which did not occur until after Strata had notice of Mercury's inability to deliver the interests promised in the agreement. Mercury therefore suggests that the offer was modifiable prior to Strata's drilling the first Lechuza well. Mercury also notes that the farmout agreement itself expressly defined the performance necessary for acceptance to be the drilling of a test well on the Lechuza tract. Mercury, however, confuses the doctrine of partial performance of a unilateral contract with the doctrine of promissory estoppel.

Mercury is correct that Strata did not begin performance on the farmout agreement until after it had knowledge of Mercury's title problems for the Lechuza tract. Mercury is also correct that the underlying unilateral agreement to transfer Mercury's lease interests to Strata was not an enforceable contract until Strata began drilling a test well on the Lechuza tract. Strata's actions in October 1992 did not serve as an acceptance of the underlying unilateral contract.

However, the farmout agreement also contained the option contract holding Mercury's offer open for 120 days. Mercury extended this option an additional 30 days, to expire on January 11, 1991. Strata paid no consideration for this option when Mercury presented the agreement to Strata, so Mercury was initially free to revoke the option at will. Nevertheless, Strata reasonably relied on this option to exercise the Mercury farmout agreement when it began drilling the Cercion well in October, before learning of the title problems. Furthermore, Strata relied on the extension of the drilling deadline to January 11 in not commencing drilling on the Lechuza tract prior to January 10. *See generally* Restatement (Second) of Contracts § 87(2) (discussing an offer binding as a option contract). Thus, Strata's reliance served as a consideration substitute for the option contract, which in turn made the underlying unilateral contract irrevocable and unmodifiable for the time allotted by the option. Mercury does not contend that it modified or revoked its offer before the date Strata began drilling the Cercion well. Consequently, when Strata did begin drilling the test well on the Lechuza tract on January 10, 1991, the farmout agreement became enforceable according to its original terms.

Mercury also argues that promissory estoppel is inapplicable here because, according to Mercury, Strata suffered no detriment when it drilled the Cercion well. Mercury points out that the first Cercion well was successful and commercially productive. However, the fact that the Cercion well was ultimately productive does not mean that Strata did not substantially change its position in reliance on the farmout agreement. In drilling the Cercion well Strata undertook a risky venture and committed itself to drilling a costly well in an unproven tract. According to Strata, the risk of drilling the first Cercion well was offset by the potential profit Strata might reap by exploiting not only the Cercion tract, but also the Lechuza tract, which was part of the same geologic formation as the Cercion tract. Had Strata and its drilling venture investors known that Mercu-

ry was unable to transfer the promised working and net revenue interests in the Lechuza tract, they would likely have been unwilling to undertake the risk and expense of drilling the wildcat test well.

Accordingly, we conclude that the trial court did not err in finding that Strata reasonably relied on Mercury's representations and substantially altered its position as a result of that reliance before learning of Mercury's title problems. As a result, the option contract became binding, and Strata was free to accept the original farmout offer by performing within the allotted time. Strata subsequently drilled test wells on three of the four 40–acre plots on the Lechuza tract in conformance with the requirements of the farmout agreement, thereby earning assignments of 100% of the working interest and 76.5% of the net revenue interest for these three plots.

## III. CONTRACT TERMS

■ Mercury next challenges the trial court's interpretation of the terms of the farmout agreement. Mercury contends that, even if the farmout agreement created a binding contract, Mercury did not breach the contract with respect to assigning the working interest in the Lechuza tract because it never promised to deliver 100% of the working interest. Mercury points out that under the farmout agreement it only agreed to "assign to Strata 100% of *Mercury's interest*." (Emphasis added). Mercury acknowledges that the agreement provided: "Mercury represents that it *owns or controls all* of that certain lease shown on Exhibit 'A' hereof, which shall constitute the 'Contract Premises.'" (Emphasis added). Mercury contends that the term "controls" only applies to the authority to manage or oversee the property and was not equivalent to the working interest. It argues that, under the plain terms of the agreement, it never represented that it had 100% of the working interest in the land and only promised to assign all of the interest it actually owned. Mercury therefore charges that the trial court erred in interpreting the language in the agreement as a promise to assign 100% of the

working interest, contrary to the plain meaning of the terms used.

■ In essence Mercury contends that the terms of the contract are facially unambiguous and therefore the trial court must enforce the clear language of the contract terms without referring to extrinsic evidence to determine their intended meaning. However, Mercury's view of New Mexico law is incorrect. In *C.R. Anthony*, 112 N.M. at 508–09, 817 P.2d at 242–43, and again in *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993), this Court rejected the four-corners approach to contract interpretation and instead allowed courts to consider extrinsic evidence concerning the circumstances surrounding the execution of the agreement to determine if contract terms are in fact ambiguous. The question whether a contract term is ambiguous is a matter of law for the trial court to determine. *Mark V*, 114 N.M. at 781, 845 P.2d at 1235. The ultimate goal of this inquiry is to ascertain the intentions of the contracting parties with respect to the challenged terms at the time they executed the contract. *C.R. Anthony*, 112 N.M. at 508–09, 817 P.2d at 242–43.

■ Even if we assume, as Mercury vigorously contends, that Mercury's representations unambiguously grant Strata less than 100% of the working interest in the Lechuza tract, the trial court was still free to consider evidence submitted by Strata that demonstrated the contract language was in fact ambiguous and which elucidated the intentions of the contracting parties at the time they executed the farmout agreement. Glenn Darden, Mercury's exploration manager, acknowledged drafting the farmout agreement on behalf of Mercury. He admitted in deposition and at trial that when he drafted the phrase, "Mercury represents that it owns or controls all of that certain lease ...," he intended to represent that Mercury owned or controlled 100% of the working interest in the lease, which it would transfer to Strata upon satisfaction of the agreement.

According to Darden's testimony, Mercury was negotiating with Strata on behalf of itself and several partners that also owned a percentage of the working interest in the Lechu-

za tract. In a letter dated September 10, 1991, which discussed negotiations between Mercury and Strata over the farmout agreement, Darden wrote to Strata that Mercury had obtained written approval of the farmout agreement from its partners that owned 94% of the working interest, and that approval from the partner which owned the remaining 6% of the working interest would be forthcoming. Darden acknowledged that Mercury believed that these partners along with itself controlled 100% of the working interest in the Lechuza tract and that Mercury had represented as much to Strata. Darden explained that he had mistakenly overlooked some additional parties that had retained a percentage of the working interest under the 1982 lease agreement executed by Superior Oil Co., a prior owner of Mercury's interest in the Lechuza tract. He admitted that he only realized his mistake after executing the farmout agreement, when Strata noticed the omission in its November 1991 title search and brought it to his attention.

Consequently, based on this evidence of the facts and circumstances surrounding the execution of the Mercury farmout agreement, we hold there is substantial evidence to support the trial court's findings that Mercury represented to Strata that it owned or controlled 100% of the working interest in the Lechuza tract and that it promised to assign this 100% working interest to Strata.

## IV. AWARD OF DAMAGES

Mercury challenges the trial court's award of damages on two grounds. First, Mercury argues that the court should have awarded Strata only 1.5% of the total calculated damages, discounting Strata's damages by the total interest Strata's drilling venture investors received under their participation agreement. Second, Mercury argues that the trial court erred in using the actual oil production from the Lechuza tract in measuring damages.

### A. Strata is Entitled to the Full Award for Damages

 Mercury argues that Strata's award for damages should be proportionately reduced by the percentage interest it gave to the other investors in its drilling venture participation agreement. Mercury points out that after entering into the Mercury farmout agreement, Strata resold to investors 98.5% of the interest it had acquired under the farmout. Mercury notes that Strata did not obtain any assignments of causes of action from the other investors before bringing this suit and therefore contends that Strata is only entitled to sue for and recover its remaining 1.5% interest in the untransferred 17.1875% working interest and 2.033258% net revenue interest.

Alternatively, Mercury notes that after the trial court entered judgement, Mercury obtained a Satisfaction and Release from Meridian, which was Strata's largest single investor in the drilling venture, having purchased a 50% share of Strata's interest. Mercury therefore argues that, at the very least, this Court should reduce Strata's award of damages by 50%. These arguments are without merit.

Strata and Mercury were initially the only parties to the Mercury farmout agreement. As noted above, Mercury was actually negotiating on behalf of several partners when it agreed to assign 100% of the working interest in the lease to Strata. All of Mercury's partners save Meridian subsequently ratified the farmout agreement. Strata, however, did not purport to act on behalf of any investor except itself. Indeed, Strata did not even enter into the participation agreement with its investors until after Mercury executed the farmout agreement.

More importantly, Mercury has not shown that Strata assigned any of its interest in the Mercury farmout agreement to its investors. Instead, Mercury concedes that Strata and its drilling-venture investors executed a separate agreement that governed the contractual rights and obligations owed between Strata and the investors. Accordingly, the investors are not in contractual privity with Mercury and therefore are not entitled to any recovery from Mercury, nor are they in a position to release Mercury from its contractual obligations to Strata. *Staley v. New*, 56 N.M. 756, 758, 250 P.2d 893, 894 (1952) ("It is the general rule of law that one

who is not a party to a contract cannot maintain a suit upon it."); *see also Jesko v. Stauffer Chem. Co.*, 89 N.M. 786, 790, 558 P.2d 55, 59 (Ct.App.1976) ("Whether one is the real party in interest is to be determined by whether one is the owner of the right being enforced and is in a position to discharge the defendant from the liability being asserted in the suit."); *Waldrip v. Hamon*, 136 F.Supp. 412, 413–14 (E.D.Okla.1955) (noting that subsequent owners of mineral rights were not in contractual privity with defendant and therefore had no standing to seek recovery for breach of contract between defendant and original lessor); *Consolidated Shelter, Inc. v. Far West Fed. Sav. & Loan Ass'n*, 88 Or.App. 275, 745 P.2d 424, 426–27 (1987) (noting that since plaintiff did not assign defendant's warrantee to subsequent buyer but instead executed a new, albeit identical, warrantee to buyer, plaintiff was proper party to sue defendant for breach of original warrantee).

■ Similarly, the release Mercury obtained from Meridian is irrelevant to the present cause of action. Meridian had no claim against Mercury under the farmout agreement that it could release. The only possible claim that Meridian or the other investors might have, if a claim exists at all, would be against Strata under the terms of the participation agreement. We therefore hold that the trial court did not err in awarding Strata 100% of the damages suffered as a result of Mercury's failure to transfer the 17.1875% working interest and 2.033258% net revenue interest as promised in the farmout agreement.

**B. The Trial Court Properly Calculated Strata's Damages**

■ Mercury's final argument is that the trial court applied the wrong measure of damages for calculating Strata's recovery. The trial court calculated Strata's damages by measuring the present value of the current and projected future production from the three wells Strata drilled on the Lechuza tract and then computing the amount of the undelivered 17.1875% working interest and 2.033258% net revenue interest based on that valuation. Using the projected oil production and a reasonable price for oil, the trial court calculated that the value of the undelivered interests totalled $616,555.22. Mercury contends that the trial court should have calculated the damages based upon the time at which Strata knew Mercury could not transfer the promised interests, which was prior to Strata's drilling the Lechuza tract wells. Mercury suggests that the court should have based the measure of damages on the market value of the land itself prior to drilling, which Mercury estimated at approximately $150 per acre, resulting in a total loss to Strata of only about $3,094. We disagree.

■ For cases in which profits are the inducement for entering into a contract, lost profits are the proper measure of damages for a breach of contract if they can be proven with reasonable certainty. *Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 389, 696 P.2d 475, 477 (1985) (addressing breach of uranium extraction contract). As the federal district court in *Petroleum Energy, Inc. v. Mid–America Petroleum, Inc.*, 775 F.Supp. 1420, 1426 (D.Kan.1991) (citation omitted), explained:

The rule as to the measure of damages for breach of contract is the same in drilling contracts as it is in other contracts. A party injured by a breach of contract is entitled to recover all his damages, including gains prevented as well as losses sustained, provided they are certain and follow from the breach. A party can recover lost profits if the lost profits can be established with reasonable certainty.

In *Petroleum Energy*, the trial court considered how to properly measure damages suffered by a lessee when the lessor breached the drilling rights contract and prevented the lessee from drilling a well. *Id.* at 1423–24. The *Petroleum Energy* court held that actual production of a well on the property is an appropriate measure for calculating lost profits on a drilling contract. The court noted:

Proof of loss involving undrilled wells, lost leases, and royalties are, by their very nature, difficult to show. Nevertheless, before a plaintiff can recover damages, he must prove with reasonable certainty the damages he suffered from the defendant's breach. When lost profits are sought as

an element of damages, the plaintiff must necessarily show what those profits would have been. The plaintiff can satisfy this burden through the introduction of evidence showing the initial and continued production of wells drilled on the lands in controversy (if available) and on other lands in the area.

*Id.* at 1426 (quoting *County Management, Inc. v. Butler,* 650 S.W.2d 888, 889–90 (Tex. Ct.App.1983) (citations omitted)); *see also Hada v. Hudson,* 694 S.W.2d 343, 347 (Tex. Ct.App.1984) (determining lost profits for untransferred revenue interest based on value of current and future well production), *judgment set aside without opinion* (Mar. 27, 1985); *cf.* 3 W.L. Summers, *The Law of Oil & Gas* § 435, at 42 (1958) (noting that proper measure of lessor's damages for undelivered royalty interest for undeveloped or underdeveloped land is the royalty value of the oil the land would have produced at the time it should have been marketed).

Accordingly, we hold that the trial court properly relied on the value of the present and projected future oil production of the three Lechuza tract wells as the basis for measuring the amount of Strata's damages for the undelivered working interest and net revenue interest. Mercury does not challenge on appeal the actual oil production and pricing figures upon which the trial court relied nor the certainty of the projections of future production for the Lechuza tract wells. We therefore affirm the trial court's damage award of $616,555.22 in favor of Strata.

## V. CONCLUSION

For the foregoing reasons we affirm the judgment of the trial court.

**IT IS SO ORDERED.**

BACA and MINZNER, JJ., concur.