**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 25, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

REALTY INTERNATIONAL
ASSOCIATES, INC.,

      Plaintiff - Appellant,

v.

CAPITAL FUND SECURITIES, Limited,
a foreign corporation,

      Defendant - Appellee.

No. 14-2189
(D.C. No. 1:12-CV-00116-MV-WPL)
(D. N.M.)

_____

**ORDER AND JUDGMENT***
_____

Before **KELLY**, **BALDOCK**, and **GORSUCH**, Circuit Judges.
_____

    Realty Investment Associates, Inc. (Realty) brought this action alleging that

Capital Fund Securities, Limited (CFS) breached a participation agreement relating to

wraparound notes on several apartment projects in New Mexico.  Realty claimed CFS

failed to fulfill a contractual obligation to approve excess refinancing of the projects'

primary mortgages, which would have generated funds for distribution to note

---

    * After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

participants, including Realty. The district court granted summary judgment for CFS, holding that it had not breached the agreement. Realty now appeals.

## I. BACKGROUND

In 2003, CFS, Realty, and others executed a participation agreement to resolve a dispute over ownership of the wraparound notes, which have unrecorded liens secondary to primary mortgages on a number of apartment projects. The agreement recognizes CFS as the holder of the notes, but grants participation rights to Realty. These rights involve a share in the proceeds from refinancing, sale, or cash flow of the projects in proportion to Realty's ownership interest in the notes. The agreement contemplated immediate refinancing of the existing primary mortgages on the projects, which was accomplished in 2004 with half of the refinancing proceeds in excess of the existing mortgage balances distributed to the note participants. The new mortgages were set to mature in 2011. "Estoppel letters," drafted by the partnership that owned the projects and signed by all note participants, stated that on or before 2011 the participants would either modify the terms of the new mortgages to extend their maturity dates or pay them off through refinancing. If the note participants failed to act, the partnership was to do so in their stead.[1] All note participants retained final signatory approval with respect to negotiations over mortgage refinancing.

---

[1] There is a dispute as to whether the partnership's authority to refinance was limited to the balances of existing mortgages. The point is immaterial to resolution of this appeal.

When the maturity dates for some of the mortgages became imminent, Realty and CFS disagreed on what course to take. Realty wanted to refinance for amounts substantially exceeding the mortgage balances in order to obtain a share of the excess proceeds. CFS wanted simply to extend the maturity date for the existing balances at lower interest rates, and sent a letter to the mortgage lender, copying the partnership owning the projects, expressing that position. Ultimately, the mortgages were refinanced by the partnership without excess proceeds for distribution to the note participants.

Realty filed suit claiming that CFS' refusal to refinance for amounts in excess of current balances (amounts acceptable to the mortgage lender) breached the participation agreement and caused Realty to lose out on its share of the forgone excess proceeds.[2] Realty alleged that the purpose of the participation agreement was to generate proceeds through excess mortgage refinancing; that the agreement prohibited any note participant from rejecting such refinancing except on the ground that it entailed objectionable loan-to-value ratios; and that no objection to the relevant loan-to-value ratios had been made by CFS or any other note participant. CFS moved for summary judgment on the basis that it had no duty under the agreement to accept the excess refinancing sought by Realty. The district court agreed with CFS and entered judgment in its favor.

_____

[2] Realty also alleged that CFS breached the agreement by interfering with negotiations between the mortgage lender and the representative designated in the agreement to negotiate on behalf of the note participants. Realty has abandoned this claim.

## II. PARTICIPATION AGREEMENT

The relevant provisions of the participation agreement can be grouped into four categories. The first consists of provisions characterizing the parties' legal interests in the notes, which specify that CFS is the holder of the notes and the other parties, including Realty, have an interest in the notes entitling them to participation in revenue derived therefrom. Aplt. App. at 22 (Recital A), 24 (para. 2).

The second category consists of provisions generally indicating that mortgage refinancing is to be done for the benefit of both CFS and participants such as Realty:

> Para. 4(d): "[R]efinancing of the existing mortgages shall be undertaken for the benefit of the holder of the Notes and to the extent permitted by the lender, the new loans shall be made for, on behalf of, or in the name of the holder of the Notes."
>
> Recital D: "[The parties] desire to have the mortgage loans on the apartment projects refinanced for the benefit of the Wrap Loan Lenders (as defined below [to include all participants in the agreement])."

*Id.* at 22, 25; *see also id.* at 24 (Recital L).

The third category consists of provisions specifying how the parties share in revenue derived from the notes, including excess proceeds from refinancing of the primary mortgages. These establish that the parties share in proportion to their interests in the notes. *See id.* at 24 (Recital K and para. 2), 26 (para. 8).

The fourth category relates to the parties' rights with respect to negotiation of mortgage refinancing. It consists of a broad provision granting the parties a right of

4

final approval over refinancing negotiations and a specific provision dealing with agreement on particular loan-to-value ratios:

> Para. 5: This paragraph designates a representative for negotiating "for the purpose of having the first mortgages on the [projects] refinanced," but provides that "all distribution participants have final signatory approval of such negotiations."
>
> Para. 4(b): "The existing mortgages shall be replaced with new mortgages at a loan to value, as mutually agreed by the participants, as the value is determined by a current appraisal."

*Id.* at 25-26.

Finally, what the agreement does not say is also significant. There are no provisions stating that (1) its purpose is to obtain excess refinancing whenever possible to maximize revenue from this source; or that (2) notwithstanding the right of final approval in paragraph 5 and the requirement of mutual agreement as to loan to value in paragraph 4(b), parties must consent to excess refinancing whenever it is available unless a specific objection is raised on loan-to-value grounds.

### III. ANALYSIS

The district court's decision does not address, or barely touches on, several contentions pressed by each side on appeal. This is clearly a consequence of the gradually developing nature of the positions taken by *both* parties. CFS argues that we should not consider points now argued by Realty that were not included in its response to CFS' motion for summary judgment. But some of these points address arguments CFS itself failed to include in that motion. Given these circumstances,

5

and the fact that our review is de novo, *see In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1202 (10th Cir. 2010), we decide this appeal—and affirm the district court—based on a simple, straightforward review of all relevant provisions of the participating agreement.

## A. CFS' Right to Reject Refinancing Based on its Status as Holder of Notes

The primary textual basis cited by CFS in its summary judgment motion for a right to reject excess refinancing (it invoked other provisions after Realty responded to the motion) was the recognition of its status as holder of the notes in paragraph 2 and the statement in paragraph 4(d) that mortgage refinancing was to be undertaken for the benefit of the holder of the notes. CFS argued these two provisions allowed it to act out of self-interest contrary to the wishes of note participants who wanted to share in proceeds from excess refinancing.

The district court found merit in this argument. Discerning nothing in the agreement preventing CFS from deciding what refinancing terms would be to its own benefit, the district court held that CFS did not breach the agreement simply because it had favored its perceived interest at the expense of a benefit to Realty. That was not the end of the district court's analysis; it still had to address Realty's overarching claim that the intent of the agreement was to obtain excess refinancing whenever available. That intent, if controlling, would effectively equate the benefit of refinancing with excess-proceed-sharing, thereby undercutting CFS' argument that its exclusive designation as intended beneficiary meant it could reject such refinancing in pursuit of some other benefit. Nevertheless, the district court still considered CFS'

6

status as note holder as supportive of its ultimate holding that CFS was not obligated by the agreement to accept excess refinancing. For that reason, it is important to acknowledge a textual counterpoint to the district court's analysis of the purportedly unique position of CFS with respect to the benefits of refinancing. As set out earlier, another provision of the agreement expressly refers to refinancing "for the benefit of the Wrap Note Lenders," Aplt. App. at 22, which includes all of the note participants, *id.* at 24. While this does not negate the intent to benefit CFS, it does deprive it of the exclusivity the district court attributed to it. ''

In this vein we need to address an argument by Realty that goes beyond asserting that CFS had no right to put its interest over the interests of the other parties to asserting that CFS had an affirmative duty to put the others' interests first. Realty premises this duty on its claim that CFS is a fiduciary vis-à-vis the note participants. There is, however, nothing in the text of the agreement about fiduciary duties to support this argument. Rather, Realty points to a document relating to an earlier, discarded proposal that would have stated "CFS was to retain 'ownership' of all wrap around mortgages *as trustee* and would distribute any proceeds in proportion to their ownership." *Id.* at 149 (emphasis added). But "the parol evidence rule precludes the admission of prior negotiations or extrinsic evidence offered to contradict or vary the terms of a complete, integrated, written agreement." *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1208 n.2 (N.M. 2008) (brackets and internal

7

quotation marks omitted).[3]  While such evidence may be "admitted to determine the

circumstances under which the parties contracted and the purpose of the contract," *id.*

(internal quotation marks omitted), the rejected proposal—read against the text of the

agreement omitting the very term Realty seeks to interpose—does not create a

genuine issue that the agreement was intended to impose a fiduciary duty on CFS.

Even if CFS' receipt of proceeds for distribution to participants might suggest some

responsibility *with respect to the proper distribution of received funds*, that would not

establish the quite different duty Realty seeks to impose on CFS to subordinate its

interests to those of the other participants.

In sum, the most that can be said of the "benefit" provisions is that they are not

dispositive of either party's position on refinancing.  Other provisions, discussed

below, supply a firmer basis for the district court's holding that CFS did not breach

the agreement by rejecting excess refinancing of the primary mortgages.

**B.  Provisions Regarding Agreement on Loan-to-Value Ratios and
Final Signatory Approval of Mortgage Refinancing Negotiations**

The district court concluded its order by noting two provisions that much more

directly undercut Realty's claim that the agreement obligated CFS to accede to

available excess refinancing:

> The 2003 Agreement gives CFS the right to disagree as to a
> proposed loan to value ratio, and to withhold final signatory approval of
> any refinancing proposal negotiated [by the participants' representative
> and the partnership owning the projects].  Nothing in the 2003

---

[3] The participation agreement states that it "constitutes the entire agreement
between the parties and supersedes all prior . . . negotiations."  Aplt. App. at 27.

> Agreement obligated CFS to agree to a certain loan to value ratio or to a certain refinancing proposal, simply because it would benefit Realty. By the same token, nothing in the 2003 Agreement entitled Realty to a refinancing at the maximum possible loan to value ratio, or to CFS' approval of a refinancing on the terms believed by Realty to be most beneficial. Accordingly, CFS could not, and thus did not, breach the 2003 Agreement by preventing the refinancing of the apartment projects [in excess of the existing balances].

Aplt. App. at 175. An obligation to accept any available excess refinancing would plainly conflict with the reservation of an unqualified right of final approval as well as with the requirement of mutual agreement on loan-to-value ratios.

Realty contends the loan-to-value provision plays no role here, because CFS did not make an objection on that basis when rejecting excess refinancing and has not demonstrated grounds for such an objection in this case. But the provision is not written in terms of *objections* to loan-to-value ratios *preventing* proposed refinancing but in terms of *mutual agreement* on loan-to-value ratios *allowing* refinancing to proceed. Thus, simply withholding agreement would in itself appear sufficient to forestall refinancing. In any event, regardless of whether the provision was actually triggered here, its acknowledgment that parties *can* block refinancing by rejecting attendant loan-to-value ratios is inconsistent with Realty's broad position that the agreement was intended to obligate participants always to accept excess refinancing. If that were indeed the intent, the agreement would not enable a participant to block excess refinancing proposals just by not agreeing to their loan-to-value ratios. But we need not rely solely on the existence of the loan-to-value provision to affirm summary judgment for CFS.

9

The agreement gives all participants "final signatory approval of [refinancing] negotiations." *Id.* at 26. An intent *not* to obligate participants to accept any specific refinancing proposal could hardly be more clear. Realty attempts to avoid this conclusion in two ways, neither of which is persuasive. First, Realty contends that the right of final signatory approval is given only for refinancing "negotiations," which should not be read to include refinancing proposals. Realty does not cite any authority supporting this strained reading of what is on its face a straightforward provision. When a contract's terms "have a common and ordinary meaning, that meaning controls in determining the intent of the parties." *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012) (internal quotation marks omitted). Even if a party seeks only to establish an ambiguity, the provision in question must be "reasonably and fairly susceptible" of the alternative construction proffered to create the ambiguity. *Id.* at 648 (internal quotation marks omitted); *see Randles v. Hanson*, 258 P.3d 1154, 1164 (N.M. Ct. App. 2011). Any commonsense reading of the signatory-approval provision would plainly encompass the right to approve/reject refinancing proposals—which are the raison d'être of negotiations.[4] The provision is not reasonably and fairly susceptible of Realty's contrary construction.

Realty's other effort to undercut the signatory-approval provision is to argue that it is qualified by the provision relating to loan-to-value ratios. Realty contends

---

[4] It appears Realty may also object to the fact that CFS peremptorily indicated its opposition to excess refinancing from the outset of negotiations. But nothing in the agreement prohibits a party from giving advance notice of an intention to exercise its right of (dis)approval with respect to refinancing.

that even if the right of approval permits a party to veto proposed refinancing, that right may be exercised only on the basis of an objection to the loan-to-value ratio of the mortgage in question. There is no textual support for this contention. The signatory-approval provision itself does not define or limit the grounds upon which approval may be withheld, nor does it make any reference to the separate provision regarding loan-to-value ratios. And nothing in the loan-to-value provision (or any other part of the agreement) ties that provision to the right of signatory approval.

In sum, CFS' contractual right to reject mortgage refinancing proposals is clearly supported by the provision giving it final signatory approval and further buttressed by the provision requiring its agreement to attendant loan-to-value ratios. Absent an overriding contractual directive qualifying these provisions by reference to the parties' intent always to secure excess refinancing, they dictate a ruling in favor of CFS here.

## C. Intent of Parties to Obtain Excess Refinancing

The existence of such an overriding directive is a premise running throughout Realty's briefing. Realty insists that the parties' predominant intent in entering the agreement was to obtain excess refinancing whenever available in order to realize immediate revenue from sharing the proceeds. CFS' alleged thwarting of this intent is the core of Realty's breach-of-contract claim. The problem for Realty is that this alleged intent is nowhere to be found in the plain terms of the agreement.

"'The purpose, meaning[,] and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not

11

ambiguous, it is conclusive.'" *Benz v. Town Ctr. Land, LLC*, 314 P.3d 688, 695 (N.M. Ct. App. 2013) (quoting *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2012)). "'When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties.'" *Id.* at 696 (quoting *CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 746 P.2d 1109, 1111 (N.M. 1987)). No provision in the participation agreement states that the intent of the parties is always to opt for excess refinancing when that is available, nor does any provision obligate a party to accept such refinancing when other parties desire it. To the contrary, as we have discussed, the relevant provisions of the agreement plainly give a party like CFS the right to reject any proposed refinancing, excess or not.

Notwithstanding the terms of the agreement, Realty contends the participants' post-agreement conduct demonstrates that it was their intent that excess refinancing had to be accepted when available. Course of performance, while inadmissible to deviate from the unambiguous terms of a contract, may be considered in determining whether a contract is ambiguous in the first place. *Benz*, 314 P.3d at 695 (discussing *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 242-43 (N.M. 1991)). Noting that earlier refinancing had generated excess proceeds, Realty argues that this reflected the parties' intent *always* to refinance in excess of mortgage balances, and that if such an intent is not expressed (or disavowed) clearly in the agreement, the result is an ambiguity leaving the contract susceptible to the reading urged by Realty.

12

We disagree.  The fact that the parties chose excess refinancing early on does not imply such refinancing was mandatory, thereby putting the provision granting a right of final approval in doubt; it simply shows that the parties had hitherto accepted excess refinancing proposals, obviating the need for anyone to exercise their right to reject such a proposal.  Tellingly, Realty does not cite a single instance when the overarching intent it seeks to read into the agreement was invoked to force a participant to accept excess refinancing to which it objected.  In short, the parties' conduct was entirely consistent with the plain meaning of the final-approval provision and thus affords no basis on which to reject or question the straightforward reading we have given to it here.  Nor is the plain meaning of that provision clouded by Realty's self-serving insistence that it had intended to obtain funds from excess refinancing under the agreement at every opportunity.  *See Ponder v. State Farm Mut. Auto Ins. Co.*, 12 P.3d 960, 965 (N.M. 2000).

## IV.  CONCLUSION

The forgoing discussion explains our rationale for affirming the grant of summary judgment for CFS.  We note the focus and thrust of that rationale have obviated discussion of a number of collateral points addressed in the parties' briefing.  Thus, for example, the belabored disputation of what should count as a financial benefit or disadvantage with respect to refinancing under the participation agreement is immaterial, as is the extraneous discussion of the "ownership" interests of the participants in the notes.  And, like the district court, we do not rely on CFS' position—advanced early in the litigation but not pressed on appeal—that the

13

agreement contemplated excess refinancing only on those mortgages in place in 2003. Realty's contention on appeal that the district court erroneously accepted this position through improper factfinding on summary judgment is both incorrect and immaterial. Finally, Realty's broader objection regarding the resolution of this case on the basis of improper factfinding is also inapt. The interpretation of unambiguous contract terms is a legal matter for the court. *Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 650 P.2d 825, 828 (N.M. 1982). The determination of ambiguity *vel non* is likewise for the court. *See Strata Prod. Co. v. Mercury Expl. Co.*, 916 P.2d 822, 830 (N.M. 1996). The district court properly concluded that the text of the agreement and extrinsic evidence did not raise a genuine issue regarding the plain meaning of the operative provisions supporting CFS' case as discussed above.

The judgment of the district court is affirmed.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

14